PEDRO J. GIOVANETTI y la SOCIEDAD LEGAL DE BIENES GANANCIALES compuesta por él y su esposa MARÍA DE LOS ÁNGELES LUGO, demandantes y peticionarios, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO, CENTRO DE FOMENTO DE EMPRESAS PARA JÓVENES, INC. y COMPAÑÍA DE FOMENTO INDUSTRIAL DE PUERTO RICO, demandados y recurridos.

*Número:* CC-1999-64 *Resuelto:* 29 de marzo de 2004

*Alfredo Ortiz Ortiz*, abogado de la parte peticionaria; *Luis A. Morales Rosado* y *Héctor Clemente Delgado*, abogados de la parte recurrida.

El Juez Asociado Señor Rebollo López emitió la opinión del Tribunal.

Mediante el presente recurso se nos solicita que revisemos una sentencia del Tribunal de Apelaciones que confirma la desestimación de la reclamación por despido por razón de discrimen político de un empleado transitorio dictada por el Tribunal de Primera Instancia. Mediante dicha sentencia, el foro apelativo intermedio concluyó que el peticionario —*empleado por contrato de una entidad creada por fondos gubernamentales determinados*— no tenía una expectativa legítima de continuidad en el empleo, por lo cual carecía de un interés en la retención de éste, y que tampoco demostró la existencia de discrimen político. Por los fundamentos que expondremos a continuación, *confirmamos*.

I

La Compañía de Fomento Industrial de Puerto Rico (Compañía de Fomento) es una corporación pública del Estado Libre Asociado de Puerto Rico con personalidad jurídica independiente y separada de éste, y con capacidad para demandar y ser demandada, ello en virtud de las dis-

posiciones de Ley Núm. 188 de 11 de mayo de 1942, según enmendada, conocida como la Ley de la Compañía de Fomento Industrial de Puerto Rico, 23 L.P.R.A. sec. 271 *et seq.* En virtud de la facultad delegada por la referida ley,[1] esta corporación pública *autorizó*, mediante la Resolución Corporativa Núm. 86–53 de 12 de junio de 1986, *la creación de una corporación subsidiaria sin fines de lucro llamada Centro de Fomento de Empresas para Jóvenes, Inc.* (Centro). Según el certificado de incorporación, dicha subsidiaria corporativa se creó para "[p]romover, organizar, administrar y desarrollar todo tipo de actividad económica *con el objeto de crear nuevas fuentes de empleo*" y para

[o]*frecer los adiestramientos y asesoramientos necesarios para crear nuevas fuentes de empleos* en pequeñas empresas o negocios, cooperativas de bienes y servicios, talleres de servicios y/o reparaciones y/o ... cualquier tipo de actividad que genere empleo o autoempleo. (Énfasis suplido.) Apéndice, págs. 55–56.

El Centro, como corporación subsidiaria, se regía por una Junta compuesta de no menos de tres directores *y su único socio era la Compañía de Fomento.* De los autos del caso surge que el primer año el Centro funcionó con fondos asignados por el Departamento del Trabajo. Ello en virtud de un contrato suscrito entre éste y el Centro al amparo de la Sec. 10(e) de la Ley Núm. 139 de 26 de junio de 1968, según enmendada por la Ley Núm. 82 de 3 de junio de 1980 (11 L.P.R.A. sec. 210(e)).[2] Transcurrido este año, el

---

[1] 23 L.P.R.A. sec. 278(*l*). Dicha sección dispone lo siguiente en cuanto a las facultades de la Compañía de Fomento Industrial de Puerto Rico (Compañía de Fomento): "obtener la organización de acuerdo con la ley y ejercer dominio parcial o total sobre compañías, asociaciones o corporaciones subsidiarias, con fines pecuniarios o no pecuniarios, afiliadas o asociadas, siempre que, a juicio de la Junta, tal arreglo sea necesario, apropiado o conveniente, para efectuar los fines de la Compañía o el ejercicio de sus poderes ...."

[2] La referida disposición de ley autoriza al Secretario del Departamento del Trabajo a utilizar los fondos devengados del programa de beneficios por incapacidad *para programas de adiestramiento y readiestramiento* de empleados. Sec. 10(e) de la Ley Núm. 139 de 26 de junio de 1968, según enmendada por la Ley Núm. 82 de 3 de junio de 1980 (11 L.P.R.A. sec. 210(e)). De los términos del referido contrato surge

Centro funcionó con fondos determinados asignados por la Asamblea Legislativa.

Por otro lado, el Programa del Cuerpo de Voluntarios al Servicio de Puerto Rico (Cuerpo de Voluntarios) fue creado por la Ley Núm. 1 de 23 de junio de 1985, según enmendada, antes conocida como la Ley del Cuerpo de Voluntarios al Servicio de Puerto Rico, 18 L.P.R.A. sec. 1411 *et seq.*([3]) Este programa tenía por objetivo el *"desarrollar un programa vasto e innovador de actividades de formación del carácter y capacitación técnico-vocacional para el desarrollo integral de jóvenes en desventaja económica ..."*. 18 L.P.R.A. sec. 1412. Otro de sus objetivos era el extender

> *... un amplísimo programa de obras, servicios y acción comunal por los participantes* donde éstos contribuyan con su esfuerzo y trabajo a resolver problemas y mitigar necesidades de la comunidad en general .... Íd.

El 15 de agosto de 1986 el Centro y el Cuerpo de Voluntarios suscribieron un acuerdo titulado Contrato de Desarrollo Conjunto y Administración. Según estipularon las partes, el Programa de Autoempresas del Cuerpo de Voluntarios pasó a ser parte del Centro como resultado de tal contrato. Ello debido a los propósitos del Centro en relación con programas como el de Autoempresas. De este modo, el Centro administró el Programa de Autoempresas desde agosto de 1986 hasta el 1 de julio de 1993, *fecha cuando cesó sus operaciones por falta de fondos.* Debido al cierre del Centro, el Programa de Autoempresas volvió a ser parte de los múltiples programas que integraban al Cuerpo

---

que éste fue otorgado para asignar unos *fondos iniciales* al Centro de Fomento de Empresas para Jóvenes, Inc. (Centro) para el *adiestramiento* de los empleados a contratar; por ello su vigencia fue de poco más de un año (entró en vigencia el 9 de junio de 1986 y permaneció vigente hasta el 31 de agosto de 1987).

([3]) La Ley Núm. 224 de 6 de agosto de 1999 redenominó esta ley como Ley Orgánica de la Administración para el Adiestramiento de Futuros Empresarios y Trabajadores.

De igual forma, toda referencia al Programa del Cuerpo de Voluntarios al Servicio de Puerto Rico se sustituyó por la Administración para el Adiestramiento de Futuros Empresarios y Trabajadores.

de Voluntarios. Antes de la disolución, el 26 de mayo de 1993 se les informó a sus ciento treinta y cinco empleados que no se les renovaría el contrato, pero que se efectuaría una reevaluación de sus puestos para determinar cuáles de ellos serían trasladados para trabajar bajo el Programa de Autoempresas, el cual pasaría a funcionar dentro del Cuerpo de Voluntarios. De alrededor de ciento treinta y cinco empleados, el Cuerpo de Voluntarios contrató setenta y dos empleados.([4])

II

Según las determinaciones de hecho realizadas por el Tribunal de Primera Instancia, el demandante, señor Giovanetti, estaba afiliado al Partido Popular Democrático y comenzó a trabajar para el Centro como parte del Programa de Adiestramiento y Empleo para Trabajadores Desplazados. La primera relación contractual entre el demandante y el Centro surgió bajo los términos del mencionado programa de adiestramiento. El aludido contrato entró en efecto el 16 de junio de 1986, y duraría hasta el 31 de agosto de 1986. El demandante se desempeñó inicialmente como Director Regional del Centro para el área regional de

---

([4]) Algunos de estos empleados presentaron demanda, alegando discrimen. El Tribunal de Primera Instancia declaró con lugar la demanda y ordenó la restitución de los empleados al encontrar que medió discrimen. El Tribunal de Circuito de Apelaciones consolidó ambos casos y revocó, al encontrar que la presunción de discrimen no quedó demostrada. Este Tribunal, luego de expedir el recurso de *certiorari* y mediante Sentencia de 27 de abril de 2000 —*Rivera v. Estado Libre Asociado*, Núm. CC-1999-65— revocó al Tribunal de Circuito de Apelaciones, al concluir que medió un discrimen político. En este caso se determinó que los empleados tenían una expectativa de continuidad de empleo. En específico, *en dicha sentencia se indicó que en los contratos de empleo de los allí demandantes existía una cláusula donde el Centro se comprometía a retenerlos permanentemente.* Bajo el entendido de que los demandantes conocían de la referida cláusula desde sus comienzos como empleados del Centro y de que ésta formaba parte de sus contratos de empleo, una mayoría de este Tribunal determinó que ello contribuyó a la formación de su expectativa de continuidad. Ello no obstante, y como detallaremos más adelante, aunque en el caso de marras existe una cláusula análoga, ésta *no* se encuentra en ninguno de los contratos de empleo del peticionario, sino en un contrato suscrito entre el Centro y el Departamento del Trabajo.

Bayamón, con un salario de $1,400 mensuales. Después de este primer contrato se otorgó el segundo por un año a partir del 1 de septiembre de 1986, y así año tras año hasta el 30 de junio de 1993, que expiró luego de que una nueva administración asumiera el control del Gobierno después de las elecciones de 1992, en las cuales resultó victorioso el Partido Nuevo Progresista (P.N.P.). Todos los contratos de empleo firmados entre el demandante peticionario, señor Giovanetti, y el Centro *tenían términos fijos de un año.*

Así las cosas, el 26 de mayo de 1993 se le informó al señor Giovanetti que a partir del 1 de julio de 1993 el Centro no recibiría más fondos para su operación, por lo que no se le renovaría el contrato. Al recibo de la antes mencionada comunicación, el demandante le expresó a la subdirectora ejecutiva del Cuerpo de Voluntarios, la Sra. Mirinda Y. Vicenty, su deseo de trabajar para esta entidad. El 1ro de junio de 1993 la señora Vicenty le comunicó al señor Giovanetti que habían evaluado su solicitud para ingresar al Cuerpo y que ésta había sido considerada favorablemente. A tales fines fue referido a la oficina del Sr. Elí Martínez y recibió instrucciones de regresar a trabajar el 1 de julio de 1993.

Llegado este día, el demandante se personó a la oficina del Sr. Elí Martínez. Pasada la mañana, el demandante recibió una llamada de un ayudante del Director Ejecutivo del Cuerpo de Voluntarios. Se le informó que se realizaría una evaluación de su puesto y que se le notificaría el resultado dentro de un término de quince días, por lo que el demandante no debía volver a la oficina hasta que se le informara el resultado. Al finalizar tal periodo, la Subdirectora le informó que no podía concederle de nuevo su plaza *y le ofreció un puesto en el Registro de la Propiedad.* El señor Giovanetti lo rechazó por no estar relacionado con su trabajo reciente.

En vista de lo anterior, el 23 de junio de 1994 el señor Giovanetti, su esposa y la sociedad legal de gananciales

compuesta por ambos presentaron una demanda ante el Tribunal de Primera Instancia, Sala Superior de San Juan. En síntesis, y en lo aquí pertinente, adujeron que las verdaderas razones para el despido del señor Giovanetti fueron de índole política. Además, alegaron que cierto contrato suscrito entre el Departamento del Trabajo y el Centro tuvo el efecto de crear puestos permanentes en el servicio de carrera para todos los empleados reclutados por el Centro.

Luego de los trámites de rigor, el juicio se realizó el 2 y 3 de octubre de 1996. Durante éste la parte demandante presentó un solo testigo, el aquí peticionario señor Giovanetti. Éste testificó sobre sus años de trabajo para el Centro. Declaró sobre las circunstancias en que no se le renovó su último contrato anual. Durante el juicio, los demandantes argumentaron que el señor Giovanetti era propiamente un empleado regular de carrera o, en la alternativa, que las circunstancias de su empleo le crearon una expectativa de continuidad en su empleo. Finalmente, los demandantes también argumentaron durante la vista en su fondo que el Centro y el Cuerpo de Voluntarios constituían una sola entidad y que, por lo tanto, el Cuerpo de Voluntarios era responsable de cualquier incumplimiento o violación de ley por parte del Centro. A esos efectos invocaron la doctrina de descorrer el velo corporativo.

Por otro lado, la parte demandada presentó un único testigo, la Sra. María Dolores Santiago, quien figuraba en ese momento como Directora del Área de Desarrollo Económico del Cuerpo de Voluntarios. La señora Santiago declaró en torno a las diferencias en identidad entre el Cuerpo de Voluntarios y el Centro, y sobre las razones del cierre de este último.

Luego de analizar y evaluar toda la prueba presentada por las partes, el Tribunal de Primera Instancia declaró *sin* lugar la demanda presentada. Dicho foro determinó, como cuestión de hecho, que la disolución del Centro *se debió*

*estrictamente a razones presupuestarias.* Determinó que del testimonio de la señora Santiago *surgía con meridiana claridad que la escasez de fondos fue la razón principal para el cierre del Centro.* Resulta importante destacar que el tribunal de instancia encontró probado que una vez el Centro "dejó de existir" por falta de fondos, también "dejó de existir" el puesto que ocupaba el señor Giovanetti; esto es, *éste no fue sustituido por ninguna otra persona.* Debe enfatizarse, *por último,* que el foro sentenciador determinó que el señor Giovanetti *no* probó que se le hiciera promesa alguna de permanencia en el empleo o de creársele una plaza de carrera, y que, aún más importante, *éste conocía plenamente el carácter transitorio del puesto que ocupaba,* razón por la cual determinó que éste no tenía, ni existía, expectativa alguna de continuidad en su empleo.[5]

Inconformes, los demandantes, aquí peticionarios, acudieron ante el Tribunal de Apelaciones. El foro apelativo intermedio *confirmó* el dictamen del foro de instancia, por lo que los peticionarios acuden ante nos —vía *certiorari*— imputándole al Tribunal de Apelaciones haber errado al

> ... no descorrer el velo corporativo y como consecuencia de dicha negativa concluir que el señor Giovanetti trabajaba para el Centro y no para el Cuerpo de Voluntarios.
> ... concluir que el señor Giovanetti no tenía una expectativa razonable de permanencia en el empleo.
> ... concluir que no quedó demostrado el prejuicio por razones políticas. Petición de *certiorari*, pág. 4.

*Expedimos* el auto. Contando con las comparecencias de las partes, y estando en condición de resolver, procedemos a así hacerlo.

---

[5] El foro de instancia basó esta determinación en las propias declaraciones del señor Giovanetti y en los términos de los contratos que éste firmaba.

# III

La parte peticionaria alega, como primer señalamiento de error, que incidió el Tribunal de Apelaciones al negarse a descorrer el velo corporativo y, como consecuencia, concluir que el señor Giovanetti trabajaba para el Centro y no para el Cuerpo de Voluntarios. Invoca la parte peticionaria la doctrina de descorrer el velo corporativo, argumentando que siendo el Cuerpo de Voluntarios su verdadero patrono, éste debe responder por cualquier actuación incorrecta por parte del Centro. En síntesis, aduce que la prueba documental y testifical desfilada ante el Tribunal de Primera Instancia demuestra que el patrono del señor Giovanetti era el Cuerpo de Voluntarios y no el Centro. *No* le asiste la razón. El Centro y el Cuerpo de Voluntarios no se pueden considerar la misma entidad, porque la doctrina aludida no aplica al presente caso y, además, porque existe prueba en el expediente que demuestra lo contrario. Veamos.

En el campo laboral, la doctrina de descorrer el velo corporativo (álter ego) se utiliza cuando una corporación toma control de otra entidad que usualmente desaparece, y se demuestra que ese cambio de mando tiene propósitos ilegales, constituye una violación a la política pública, se perpetuaría una injusticia o un fraude, o se incumpliría con una obligación. *El análisis en tal caso requiere que se demuestren propósitos o intentos de cometer actos ilegales.* Véanse: *Rodríguez v. Bco. Gub. de Fom. P.R.*, 151 D.P.R. 383 (2000); *J.R.T. v. Asoc. C. Playa Azul I*, 117 D.P.R. 20 (1986); *J.R.T. v. Marex Const. Co., Inc.*, 103 D.P.R. 135 (1974). En este caso, el expediente no demuestra propósitos o intentos de cometer actuaciones ilegales; por el contrario, las actuaciones tanto del Centro como del Cuerpo de Voluntarios estaban autorizadas por las leyes habilitadoras correspondientes.

■ Por otro lado, el distintivo fundamental para que una corporación pública sea considerada subsidiaria de otra consiste en que el estatuto en virtud del cual existe la primera le imparta a ésta dicha característica y tenga personalidad jurídica propia. *Rodríguez v. Bco. Gub. de Fom. P.R.*, ante. En el caso de autos, la Compañía de Fomento está facultada por su estatuto habilitador a obtener la organización y el dominio parcial o total sobre compañías, asociaciones o corporaciones subsidiarias, con o sin fines pecuniarios, siempre que a juicio de la Junta tal arreglo sea necesario, apropiado o conveniente para efectuar los fines de la Compañía. 23 L.P.R.A. sec. 278(*l*). Es en virtud de esta facultad que la Compañía de Fomento creó el Centro, *con personalidad jurídica propia y amplias facultades para ejecutar sus objetivos de crear nuevas fuentes de empleo y de autoempleo.*

Asimismo, la Ley del Cuerpo de Voluntarios al Servicio de Puerto Rico facultaba al Cuerpo de Voluntarios a

... ceder, sujeto a la aprobación del Secretario del Trabajo y Recursos Humanos, a cualquier agencia del Gobierno del Estado Libre Asociado de Puerto Rico, cualesquiera fondos, propiedad, personal u otros recursos que estime conveniente para que dicha agencia se haga cargo de la administración de proyectos o programas establecidos de acuerdo a las disposiciones y los propósitos de [dicha ley]. 18 L.P.R.A. sec. 1441(b).

En virtud de esta ley es que el Cuerpo de Voluntarios y el Centro otorgaron un acuerdo de colaborar juntos. A esos efectos, el Art. 13 de la Ley del Cuerpo de Voluntarios al Servicio de Puerto Rico, 18 L.P.R.A. sec. 1441(a), disponía que

[l]a Administración podr[ía] utilizar, mediante convenio con cualquier agencia del Gobierno del Estado Libre Asociado de Puerto Rico ... cualesquiera fondos, propiedad, personal u

otros recursos que [fuesen] necesarios para realizar conjunta-
mente cualquier proyecto o actividad dentro de la encomienda
de la Administración establecido por [la ley].

De lo expuesto anteriormente se colige que el Centro era
una corporación subsidiaria creada por la Compañía de
Fomento. El señor Giovanetti contrató directamente con el
Centro y, además, el Centro fue la entidad que inicial-
mente recibió fondos para la creación de empleos directa-
mente del Departamento del Trabajo.

Por otro lado, tenemos que los objetivos y propósitos del
Centro y el Cuerpo de Voluntarios eran similares en ciertos
aspectos, *mas no idénticos*.[6] Por un lado, el Centro se de-
dicaba a crear nuevas fuentes de empleo, mientras el
Cuerpo de Voluntarios se dedicaba a crear programas de
capacitación técnico-vocacional y a preparar a la juventud
para el autoempleo y el empleo remuneratorio. El hecho de
que el Centro y el Cuerpo de Voluntarios tuviesen propósi-
tos similares y que llegaran a un acuerdo de colaboración,
*no* demuestra en forma alguna que ello se haya elaborado
con el fin de defraudar o violentar la ley, o que ambas en-
tidades constituyan una sola. Por el contrario, entendemos
que la creación del Centro se debió a la disposición de fon-
dos para ello. Luego de su creación, y conforme a su ley
habilitadora, el Cuerpo de Voluntarios aprovechó dicha si-
tuación para así delegar en el Centro la administración de
uno de sus múltiples programas. Al surgir el recorte de
fondos, el Centro dejó de existir y el programa pasó nueva-
mente a manos del Cuerpo de Voluntarios. Todo lo anterior
se realizó de forma lícita.

En virtud de lo antes expuesto, concluimos que la
doctrina de descorrer el velo corporativo *no* aplica al pre-

---

[6] De las determinaciones de hecho realizadas por el tribunal de instancia no
surge que éste haya encontrado que las funciones del Centro y el Cuerpo de Volun-
tarios fueran idénticas ni similares.

sente caso([7]) y, además, que el Centro y el Cuerpo de Voluntarios eran entidades distintas e independientes.

## IV

Como segundo señalamiento de error alegan los peticionarios que erró el Tribunal de Apelaciones al concluir que el señor Giovanetti no tenía una expectativa razonable de continuidad en el empleo, ya que las funciones y el tipo de trabajo que ejercía eran propias de un empleado permanente. Argumentan que las circunstancias particulares del caso son suficientes para crear en el señor Giovanetti una expectativa razonable de permanencia en el empleo. Aducen que, teniendo una expectativa de continuidad, el señor Giovanetti tenía un interés reconocido en la retención de su empleo. En tal virtud, alegan los peticionarios que dicho interés no podía serle privado sin un debido proceso de ley ni podía ser cesanteado sin seguirse las disposiciones del Reglamento de Personal aplicable a los empleados públicos. *No* les asiste la razón. Veamos por qué.

■ A. Reiteradamente hemos resuelto que un empleado público tiene un reconocido interés en la retención de su empleo en tanto dicho interés esté protegido por ley, como ocurre con los empleados de carrera, o las circunstancias del empleo le creen una expectativa de continuidad. *García v. Mun. de Arroyo*, 140 D.P.R. 750, 754 (1996); *Depto. Recs. Naturales v. Correa*, 118 D.P.R. 689, 693 (1987). *De existir este interés*, la agencia nominadora ten-

---

([7]) Resulta preciso aclarar que existe otra doctrina, *no invocada por el peticionario*, la cual ha sido adoptada por este Tribunal para atender casos de obligaciones contraídas por patronos antecesores, cuando los patronos sucesores se niegan a acatarlas. Dicha doctrina es la del "patrono sucesor" (*successorship*). No obstante, entendemos que esta doctrina no aplica al caso de autos, ya que no se ha demostrado que en éste haya ocurrido una venta o transferencia de activos o una reorganización de un negocio. Tampoco se probó una similaridad sustancial en la operación de la empresa ni una continuidad en la identidad de ésta antes y después del cambio. Véase *Piñeiro v. Int'l Air Serv. of P.R., Inc.*, 140 D.P.R. 343 (1996).

dría que seguir ciertos procedimientos para privar al empleado de su empleo, de forma que se cumpla con el debido proceso de ley. *Perry v. Sindermann*, 408 U.S. 593, 599 (1972). Además, tendría que acatar las disposiciones para cesantías establecidas en el Reglamento de Personal de la Administración Central. Veamos, en primer lugar, si el señor Giovanetti tenía un interés en la retención de su empleo *protegido por ley*.

La Ley de Personal del Servicio Público de Puerto Rico, 3 L.P.R.A. sec. 1301 *et seq.*,[8] aprobada el 14 de octubre de 1975, según enmendada, establece dos categorías básicas de empleados públicos, a saber: empleados de carrera y empleados de confianza. 3 L.P.R.A. sec. 1349. La mayor diferencia entre estas dos categorías de empleados es que los primeros deben pasar por el proceso de reclutamiento y selección que detalla la antes mencionada ley. 3 L.P.R.A. sec. 1333. Este tipo de empleado, una vez reclutado como empleado de carrera, goza de seguridad en el empleo y sólo puede ser destituido por una causa justa y previo a ciertos trámites de rigor. 3 L.P.R.A. sec. 1336.

La Ley de Personal del Servicio Público de Puerto Rico provee, además, para una tercera categoría de empleado, los llamados "empleados transitorios". 3 L.P.R.A. secs. 1333(12) y 1336(9). Al momento de la creación del Centro en 1986, la Sec. 4.3(12) de la referida ley, 3 L.P.R.A. 1333(12) (ed. 1978), disponía lo siguiente:

> Las personas nombradas en puestos de duración fija tendrán status transitorio. *La duración de estos nombramientos corresponderá al período por el cual se cree el puesto.* Podrán efectuarse nombramientos transitorios en puestos permanen-

---

[8] *Quaere* si esta legislación aplica a los empleados de la Compañía de Fomento Industrial, sus subsidiarias y a los empleados del antes existente Cuerpo de Voluntarios (adscrito a la Oficina del Gobernador). Véase 3 L.P.R.A. sec. 1338, donde se disponen las entidades excluidas de la Ley de Personal del Servicio Público de Puerto Rico.

tes según se determine mediante reglamento. (Énfasis suplido.)(⁹)

Es importante señalar que en 1989 la Sec. 4.2 de la Ley de Personal del Servicio Público de Puerto Rico fue enmendada mediante la Ley Núm. 56 de 16 de agosto de 1989 (3 L.P.R.A. sec. 1332(12)), para aclarar y detallar la razón de ser de este tipo de empleado.(¹⁰) A tales efectos, el inciso (12) de la mencionada sección actualmente dispone lo siguiente:

Cuando surjan necesidades temporeras, de emergencia, imprevistas *o de una duración determinada* se crearán puestos de duración cuya vigencia no será mayor de veinticuatro (24) meses ....

Las agencias podrán crear puestos de duración fija por un período mayor de veinticuatro (24) meses, previa aprobación del Director; *en el caso de programas o proyectos de duración determinada financiados con fondos federales, estatales o combinados. En este último caso, los puestos se podrán extender por la duración del programa o proyecto.* (Énfasis suplido.) 3 L.P.R.A. sec. 1332(12).

La Exposición de Motivos de la Ley Núm. 56, ante,(¹¹) dispone lo siguiente en cuanto a los motivos de las enmiendas antes discutidas:

*Los nombramientos transitorios de duración fija corresponden al periodo para el cual se cree el puesto.* Este mecanismo de nombramiento transitorio sólo debe utilizarse en situaciones imprevistas o de emergencia, tales como aumentos periódicos en el volumen de trabajo, sustitución de empleados en

---

(⁹) A pesar de que la Ley Núm. 56 de 16 de agosto de 1989 (3 L.P.R.A. sec. 1333(12)) enmendó en parte la Sec. 4.3(12) de la Ley de Personal del Servicio Público de Puerto Rico, 3 L.P.R.A. sec. 1333(12), ésta continuó disponiendo que *"[l]as personas nombradas en puestos de duración fija tendrán status transitorio"*. (Énfasis suplido.) Dicha ley enmendó, además, el inciso (13) de esta Sec. 4.3 (3 L.P.R.A. sec. 1333(13)), para establecer que "[l]os nombramientos transitorios en puestos de duración fija se efectuar[ían] por el período por el cual se cre[ara] el puesto .... Dichos nombramientos no podrán exceder de veinticuatro (24) meses, *excepto en los puestos autorizados para programas o proyectos de duración determinada"*. (Énfasis suplido.)

(¹⁰) De esta forma se añadió el inciso (12). De igual forma, la Ley Núm. 3 de 29 de diciembre de 1989 sustituyó "dieciocho (18) meses" por "veinticuatro (24) meses".

(¹¹) P. de la C. 445, Ley Núm. 56 de 16 de agosto de 1989.

licencia con paga, *en el inicio de nuevos programas o necesida-
des particulares mientras se crean los puestos, y proyectos es-
peciales de duración determinada.* (Énfasis suplido.) 1989 Le-
yes de Puerto Rico 257–258.

A tono con tal intención legislativa, podemos concluir
que mediante la aprobación de la Ley Núm. 56, ante, la
Asamblea Legislativa tuvo el propósito de aclarar que los
puestos transitorios pueden ser utilizados no sólo para ne-
cesidades temporeras, de emergencia o imprevistas, sino
también *para proveer flexibilidad en la creación de empleos
en programas creados con fondos particulares, con los cua-
les no se contará indefinidamente.*[12]

En resumen, y en vista del término fijo del contrato de
empleo del señor Giovanetti, así como de las circunstancias
en que su empleo fue creado, concluimos que éste osten-
taba un nombramiento de carácter transitorio. Durante un
periodo de siete años el señor Giovanetti estuvo *año tras
año* firmando contratos de empleo en los que se estipulaba
*expresamente* cuál sería el término de duración de su con-
trato de empleo, disponiéndose claramente una fecha de
comienzo y una de terminación. Hemos realizado un estu-
dio minucioso de cada uno de estos contratos y estamos
*convencidos* de que en ninguno de ellos se le ofreció al se-
ñor Giovanetti algo más que un nombramiento de carácter
transitorio.

Ahora bien, lo anteriormente expuesto no dispone com-

---

[12] Así lo reconoció el Tribunal Federal de Apelaciones para el Primer Circuito
en *Arbona Torres v. Aponte Roque*, 831 F. 2d 26, 27–28 (1er Cir. 1987). Dicho foro
judicial, al reconocer el uso de empleados transitorios en entidades que funcionan
con fondos asignados en forma determinada, ya que dependen de la asignación de
éstos para su funcionamiento, expresó:
"*Because the School Lunch Program ('Program') is financed entirely with federal
funds, the amount of which may vary from year to year*, plaintiffs were among the
hundreds of Program employees who receive 'transitory,' one-year appointments that
are renewed as a matter of course if funding permits. Such transitory employees are
to be distinguished from career employees, who must compete for their positions but
who may only be discharged for cause. *The use of transitory employees thus gives the
Program more flexibility to reduce its workforce in the event of a cutback in federal
funding. The arrangement also saves the Program the expense of contributing to the
more generous benefits enjoyed by career employees.*" (Énfasis suplido.)

pletamente del asunto ante nos; es necesario que determinemos, además, si los empleados transitorios tienen o no un interés en la retención de su empleo que esté reconocido por ley. La respuesta a esta interrogante es en la afirmativa, aunque *únicamente* durante la duración de su nombramiento. Veamos.

El Reglamento de Personal de la Administración Central (Reglamento Núm. 2186 de la Oficina Central de Administración de Personal), Sec. 7.9, págs. 54–56, claramente establece que los empleados con nombramiento transitorio no se consideran empleados de carrera. Igualmente indica que ninguna persona que haya recibido nombramiento de ese tipo puede ser nombrada a desempeñar puestos en el servicio de carrera a no ser que pase por el proceso de reclutamiento y selección que establece la Sec. 4.3 de la Ley de Personal del Servicio Público de Puerto Rico, ante. Reglamento de Personal, ante; *Depto. Recs. Naturales v. Correa*, ante, pág. 695. Véase, además, 3 L.P.R.A. sec. 1333(14).

No obstante lo anterior, este Tribunal ha reconocido *que los empleados transitorios gozan de una expectativa de retención de empleo durante el término de su nombramiento, mas no cuando éste ha vencido.* A esos efectos, en *Depto. Recs. Naturales v. García*, ante, pág. 697, expresamos que

> [e]xaminada la Ley de Personal, el reglamento y el historial legislativo de esa medida, *concluimos que un nombramiento transitorio genera expectativa de retención en el empleo sólo durante el término del nombramiento.* Ante el claro mandato legislativo, resulta inescapable concluir que bajo las disposiciones de la Ley de Personal del Servicio Público un empleado transitorio *no goza de derecho a permanencia en su puesto ni tiene expectativa legítima de retención en el mismo una vez ha vencido el nombramiento.* (Énfasis suplido.)

Debido a que la expectativa de retención de empleo de un empleado transitorio *se extiende únicamente du-*

*rante la duración de su nombramiento*, de ser cesanteado dentro de este término, la autoridad nominadora *viene obligada* a seguir los procedimientos de la Sec. 9.3 del Reglamento de Personal, ante, págs. 75–78. Ello obedece a que el principio de mérito cobijado por dicha sección abriga a todos los empleados públicos y a que la retención de empleo es un área esencial del mérito.

Ahora bien, cuando un nombramiento transitorio vence y éste no se le extiende al empleado nuevamente, ya no existe la expectativa de retención. Por tal razón, la agencia nominadora no adviene obligada a seguir los procedimientos de la Sec. 9.3 del Reglamento de Personal, ante, cuando decide no renovar un nombramiento transitorio.[13] Cónsono con lo anterior, en *Depto. Recs. Naturales v. Correa*, ante, pág. 700, concluimos que "[e]xpirado el término de un nombramiento transitorio, la agencia *no viene obligada a demostrar justa causa para no renovar el nombramiento*". (Énfasis suplido.)

En virtud de lo anterior, resulta inescapable la conclusión de que la ley *no* le reconoce un interés en la retención de empleo al señor Giovanetti. *Ello no obstante, debemos examinar si las circunstancias de su empleo le crearon una expectativa de continuidad.* De ser ello así, el señor Giovanetti tendría un interés en la retención de su empleo y, por lo tanto, estaría protegido por el debido proceso de ley y las disposiciones de cesantías antes mencionadas.

B. Tal y como señaláramos, el Centro para el cual trabajaba el peticionario fue creado por la Compañía de Fomento Industrial. Dicho Centro funcionaba de acuerdo con ciertos fondos asignados anualmente. De esta asignación de fondos dependía directamente no sólo la contratación de los empleados del Centro, sino también su propia

---

[13] Recordemos que abstenerse de extender un nuevo nombramiento transitorio no constituye una suspensión o destitución. Véanse: *Depto. Recs. Naturales v. Correa*, 118 D.P.R. 689 (1987); *Martínez v. Colom, Comisionado*, 51 D.P.R. 417, 421 (1937). Véase, además, 3 L.P.R.A. sec. 1336(6)(a).

existencia. Es por ello que en cada uno de los contratos suscritos entre el Centro y sus empleados se hacía referencia a la procedencia de los fondos en virtud de los cuales se realizaba la contratación. El señor Giovanetti leyó y firmó cada uno de estos contratos, razón por la cual debemos razonablemente presumir que conocía sobre la fragilidad de su puesto. No podemos perder de perspectiva el hecho de que Giovanetti contaba con una preparación en Derecho, la cual lo colocaba en una posición privilegiada al momento de analizar e interpretar cada una de las cláusulas de los contratos por él firmados.(14)

Asimismo, el peticionario tenía pleno conocimiento de la duración fija de su puesto y de su carácter transitorio. A esos efectos, el tribunal de instancia indicó en su sentencia que

> [d]esde el comienzo de su relación contractual el Sr. Giovanetti *estaba consciente* del carácter transitorio de sus nombramientos. En todos los contratos claramente se establecía la duración de los mismos por un término de un año. (Énfasis suplido.) Apéndice, pág. 49.

 Más aún, de la Exposición Narrativa de la Prueba se desprende que el señor Giovanetti firmaba contratos anuales, conociendo que éstos se extendían por un término fijo. Además, surge que éste *visitó personalmente* a varios legisladores con el propósito de cabildear para que su puesto y el de otros empleados se convirtieran en permanentes. *Evidentemente el peticionario conocía que su empleo tenía un estatus transitorio, por lo que no puede sostener válidamente que tenía una expectativa real de que su nombramiento podía tener permanencia.* A esos mismos efectos, en *Depto. Recs. Naturales v. Correa,* ante, pág. 694, reiterado por *Orta v. Padilla Ayala,* 131 D.P.R. 227, 245 (1992), expresamos:

---

(14) Surge de los autos que el señor Giovanetti fue admitido por este Tribunal al ejercicio de la abogacía el 4 de enero de 1974 y al del notariado el 16 de enero de 1975.

Por el contrario, el recurrido era consciente de que la plaza que ocupaba era una transitoria, y a término fijo. El que ostenta un nombramiento transitorio, con el conocimiento de que el mismo vence transcurrido el término para el cual fue expedido, no puede sostener válidamente que tiene una expectativa real de que dicho tipo de nombramiento le brinda permanencia en su empleo o derecho a que el mismo se le extienda constantemente. (Citas omitidas.)

■■■ Por otro lado, los peticionarios argumentan que la renovación continua del contrato de empleo del señor Giovanetti aportó a su alegada expectativa de retención de empleo. Hemos resuelto, sin embargo, que " 'el mero hecho de ocupar una posición por un prolongado periodo de tiempo no crea por sí solo un interés propietario ...' ". *Depto. Recs. Naturales v. Correa*, ante, pág. 699, citando a *Morales Narváez v. Gobernador*, 112 D.P.R. 761, 768 (1982). Véase *Orta v. Padilla Ayala*, ante.

Más aún, y como señaláramos, el peticionario no demostró que se le hiciera promesa alguna de permanencia o de obtener un puesto de carrera. Y de existir dicha promesa, de todos modos ésta sería insuficiente para crear una expectativa de continuidad en el empleo. *Depto. Recs. Naturales v. Correa*, ante, pág. 699. Sobre ese punto, el tribunal de instancia correctamente expresó que

[e]n primer lugar no se demostró que se le hubiere ofrecido un puesto de carrera y aun de haber existido tal promesa no se demostró como en el caso de Lupiáñez que se hubiese efectuado un trámite dirigido a efectivamente concederle la permanencia. Apéndice, pág. 49.

De acuerdo con lo expresado anteriormente, resolvemos que el peticionario, señor Giovanetti, ocupaba un puesto transitorio y las circunstancias de su empleo no ameritan que se reconozca una expectativa legítima de continuidad en éste. Resolvemos, además, que al *no* renovársele su contrato no se tenían que seguir las disposiciones de cesantías dispuestas en el Reglamento de Personal ni tampoco se le violó su debido proceso de ley.

Por último, resulta importante destacar *que en el caso de autos el señor Giovanetti ocupó su puesto hasta finalizado su contrato y, entonces, éste dejó de existir ya que por acción legislativa se eliminó la asignación de fondos.* Incluso, la entidad para la que trabajaba fue disuelta en su totalidad. *Por esta razón, entendemos que no existe realmente un interés propietario del que se le haya privado al peticionario, señor Giovanetti, sin un debido proceso de ley.* De existir un interés propietario, éste dejó de existir una vez el Centro cesó sus funciones por falta de fondos y el puesto transitorio que ocupaba desapareció.[15]

C. Por otro lado, los peticionarios argumentan que la cláusula quinta del contrato suscrito entre el Departamento del Trabajo y el Centro tuvo el efecto automático de crear puestos permanentes en el servicio de carrera para todos los empleados a ser contratados.[16] En tal virtud, argumentan que el señor Giovanetti era propiamente un empleado regular de carrera. No les asiste la razón. Veamos.

En primer lugar, es importante recordar que al momento en que se firmó el contrato aquí en controversia, la Ley de Personal del Servicio Público de Puerto Rico disponía para tres tipos de empleados: los de confianza, los tran-

---

[15] En el caso *Vargas v. Barceló*, 385 F. Supp. 879, 881 (D. P.R. 1974), confirmado en *Muñoz Vargas v. Romero Barceló*, 532 F.2d 765 (1er Cir. 1976), la Corte de Distrito Federal para el Distrito de Puerto Rico resolvió que era muy distinto un reclamo de debido proceso de ley cuando una persona es despedida, o no se le renueva un contrato, aun cuando un puesto que ocupa un empleado deja de existir. A esos efectos, la corte de distrito indicó:

"In a case in which executive action is taken to terminate an individual from a job in which he has a property interest, the courts can and will require that such an interest not be taken without due process of law. *Perry v. Sindemann*, 408 U.S. 593 (1972). In such a case, the individual is afforded notice, an evidentiary hearing and reasons for the action taken. *However, the case at bar in which certain jobs were eliminated by legislative action is obviously different. The 'process' which was 'due' in this case was simply* that the legislation in question be duly enacted and executed ... *but the court is aware of no reason or authority why as a matter of procedural due process elected representatives should have to otherwise justify their decision to the individuals holding public jobs which are eliminated.*"

[16] Cabe señalar que el peticionario *no* arguye que la referida cláusula le haya creado algún tipo de expectativa de retención en el empleo.

sitorios y los de carrera. Somos del criterio que si la intención de las partes hubiese sido que los puestos que creara el Centro fueran, automáticamente, regulares en el servicio de carrera, así se hubiese dispuesto expresamente en el contrato.

■■■ Sobre este particular el Art. 1233 del Código Civil, 31 L.P.R.A. sec. 3471, dispone que "[s]i los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas". Asimismo, el Art. 1235 del Código Civil, 31 L.P.R.A. sec. 3473, establece que "[c]ualquiera que sea la generalidad de los términos de un contrato, *no deberán entenderse comprendidos en él cosas distintas y casos diferentes* de aquellos sobre los que los interesados se propusieron contratar". (Énfasis suplido.)

El contrato aquí en controversia disponía claramente que:

> El "PATRONO" se comprometi[ía] a retener permanentemente en el empleo a la persona por la cual [hubiese] recibido el subsidio salarial, después de finalizar la fecha de vigencia del contrato, *excepto en los casos en que haya justa causa para no retenerlo, conforme a la legislación laboral.* (Énfasis suplido.) Apéndice, pág. 64.

Es de advertir que en ningún momento las partes pactaron que los puestos a ser creados por el Centro para los empleados cuyos sueldos subvencionó el Departamento del Trabajo serían en el servicio de carrera. Esto es, la cláusula en cuestión *no* tuvo el efecto de crear ipso facto un puesto permanente en el servicio de carrera para Giovanetti. Dicha interpretación sería contraria a los claros términos del contrato ante nos.

Ahora bien, sin lugar a dudas, la cláusula en cuestión sí podría ser interpretada como una cláusula a favor de terceros. Véanse: Art. 1209 del Código Civil, 31 L.P.R.A. sec. 3374; *Bco. Central Corp. v. Yauco Homes, Inc.*, 135 D.P.R. 858 (1994). *No obstante,* debe quedar claro que la

obligación contractual del Centro se enfocaba *en retener* a los empleados para los cuales recibió el subsidio salarial inicial, subsidio que fue la razón medular del contrato, y *no* en otorgar puestos permanentes en el servicio de carrera. La razón es sencilla: se trataba de unos puestos que dependían de asignaciones económicas anuales para las cuales no existía seguridad alguna ni certeza de ser recibidas. El Centro no podía comprometerse a otorgar a los empleados adiestrados puestos permanentes de carrera, pues su existencia era incierta. A lo único que podía obligarse era a lo que en efecto se obligó: a *retener* esos empleados por todo el tiempo que durara su existencia.

En conclusión, conforme los hechos del caso ante nuestra consideración, el Centro cumplió cabalmente con lo estipulado en el contrato aquí en controversia *al retener* al señor Giovanetti en su empleo *hasta que, por razón de falta de fondos, se vio en la necesidad de no renovarle su contrato.* La falta del subsidio, o de los fondos provistos, *constituye la justa causa* de que habla la antes citada cláusula quinta. Queda claro, entonces, que Giovanetti no tiene derecho alguno a exigir un puesto permanente en el servicio de carrera que su patrono nunca se obligó a otorgar y en relación con el cual él nunca tuvo expectativa de continuidad.

## V

Como último error, aducen los peticionarios que quedó demostrado el prejuicio por razones políticas, porque durante el juicio en su fondo desfiló evidencia suficiente a esos efectos. Argumentan que tanto el tribunal de instancia como el de apelaciones erraron al no concluir que la presunción de discrimen, según reconocida en *Orta v. Padilla Ayala*, ante, quedó establecida. Tampoco les asiste la razón. Veamos por qué.

La Sec. 1 del Art. II de la Constitución del Es-

tado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, ed. 1999, pág. 257, prescribe en forma clara que "[n]o podrá establecerse discrimen alguno por motivo de raza, color ... ideas políticas o religiosas". Debido al lenguaje terminante de esta sección, en reiteradas ocasiones hemos reconocido que no cabe el discrimen político contra un empleado público, incluyendo los de confianza, los irregulares y los transitorios. *Aponte Burgos v. Aponte Silva*, 154 D.P.R. 117 (2001); *Alberty v. Bco. Gub. de Fomento*, 149 D.P.R. 655 (1999).

Ahora bien, un empleado transitorio sólo tendrá un remedio ante los tribunales por un reclamo de despido por discrimen político si las razones por las cuales fue despedido *son exclusivamente políticas*. Es decir, si la agencia nominadora puede demostrar, mediante preponderancia de la prueba, que el contrato no se renovó por otras razones, entonces no cabe hablar de un remedio por discrimen político. *Aponte Burgos v. Aponte Silva*, ante. Estas razones pueden ser: (i) *la falta de fondos*; (ii) el desempeño inadecuado del empleado en cuanto a sus funciones se refiere, o (iii) cualquier otra razón justificada. Íd.

En el caso de autos el peticionario *no* presentó prueba demostrativa alguna de que fuese despedido por su afiliación política. Por el contrario, de los autos surge que luego de informársele que el Centro sería disuelto por falta de fondos fue considerado para un puesto en el Cuerpo de Voluntarios e incluso se le ofreció un puesto regular en el Registro de la Propiedad que éste no aceptó. Más aún, el peticionario *no* demostró que existiera un puesto igual al que él ocupaba en el Centro y, mucho menos, que haya sido sustituido por alguien de una afiliación política diferente. Sobre este punto, el foro de instancia expresó:

El demandante no presentó prueba demostrativa de que fue suspendido por su afiliación política. Por el contrario, fue llamado con posterioridad al vencimiento de su contrato para ser evaluado para un puesto en el Cuerpo de Voluntarios. En

efecto se le ofreció un puesto de Registrador de la Región de San Juan. El motivo de la no renovación del contrato fue la disolución del Centro por lo que el puesto que ocupó el Sr. Giovanetti dejó de existir y no fue sustituido por alguien ya fuera de igual o de diferente afiliación política. *Orta v. [Padilla] Ayala,* supra. Apéndice, pág. 50.

De hecho, de los autos surge claramente que entre los reclutados por el Cuerpo de Voluntarios, una vez disuelto el Centro, se encontraban personas identificadas con todas las ideologías políticas, incluso partidarios del Partido Popular Democrático.

En cuanto al cierre del Centro por razones presupuestarias y de política pública, el tribunal sentenciador entendió que ello quedó demostrado por el testimonio de la Sra. María Dolores Santiago, quien en esos momentos se desempeñaba como Directora del Área de Desarrollo Económico del Cuerpo de Voluntarios. Sobre ello, el tribunal sentenciador expresó que "quedó demostrado que la determinación de la disolución del Centro fue una fundada en razones presupuestarias y de política pública". Apéndice, pág. 45. En vista de que el peticionario era un empleado transitorio y existía una causa justificada para no renovársele el contrato, no cabe hablar de despido por discrimen político en este caso.

■■■ A esos efectos, debemos recordar la norma de deferencia que deben tener los foros apelativos en cuanto a las determinaciones de hecho y la apreciación de la prueba que realiza un tribunal de instancia. En ausencia de pasión, prejuicio, error manifiesto o parcialidad, este Tribunal no intervendrá con las determinaciones de hecho y la apreciación de la prueba que realizan los foros de instancia. *Argüello v. Argüello,* 155 D.P.R. 62 (2001); *Trinidad v. Chade,* 153 D.P.R. 280 (2001). En el caso de autos, el tribunal sentenciador no actuó con prejuicio, pasión o parcialidad y tampoco cometió error manifiesto, razón por la cual no debemos intervenir con sus determinaciones. Al contrario, un examen sereno y minucioso de los autos nos

convence de que la determinación del foro de instancia fue racional, justiciera y jurídica. *Procede la confirmación de la sentencia recurrida.*

*Se dictará sentencia de conformidad.*

La Juez Presidenta Señora Naveira Merly concurrió con el resultado sin opinión escrita. El Juez Asociado Señor Fuster Berlingeri disintió sin opinión escrita.