La Jueza Asociada Señora Pabón Charneco
emitió la opinión del Tribunal.
r-H
Como máximos intérpretes del derecho estatal, hoy atendemos un recurso de Certificación Interjurisdiccional solicitado por el Tribunal de Distrito Federal para el Distrito de Puerto Rico (Tribunal de Distrito). En este, deter *101 minamos el poder del Gobernador de Puerto Rico para destituir a un funcionario al cual le fue delegado un híbrido de funciones ejecutivas, cuasilegislativas y cuasijudiciales. Particularmente, debemos determinar si el Procurador de las Personas con Impedimentos es un funcionario de libre remoción o solo puede ser destituido por alguna de las causas establecidas en la ley. Concluimos que tiene un interés propietario durante la duración de su nombramiento. Por lo tanto, no es un funcionario de libre remoción y solo podrá ser destituido por las causas establecidas a esos efectos por ley.
Por otra parte, determinamos que la Doctrina de Inmunidad Legislativa no limita el derecho propietario del cual es acreedor este funcionario. Su destitución no está cobijada por la inmunidad legislativa, pues no es una actividad legislativa legítima, sino un acto de naturaleza administrativa. Por otro lado, reiteramos que cuando la Asamblea Legislativa deroga un cargo y crea otro con nombre diferente, pero preservando los deberes y las obligaciones del primero, el funcionario que lo poseía no pierde el interés propietario sobre dicho cargo.
I—i hH
El Sr. Iván Díaz Carrasquillo (en adelante señor Díaz Carrasquillo o Procurador), juramentó como Procurador de la Oficina de las Personas con Impedimentos el 15 de noviembre de 2011. El nombramiento fue por un término de diez (10) años, según dispuesto en el Plan de Reorganización Núm. 1-2011, conocido como el Plan de Reorganización de las Procuradurías, 3 LPRAAp. XVII. Cónsono con ello, el término del nombramiento del señor Díaz Carrasquillo se extendía hasta noviembre de 2021.
No obstante, el 24 de julio de 2013, bajo la administración del entonces recién electo Gobernador de Puerto Rico, Hon. Alejandro García Padilla (en adelante Gobernador), *102 se aprobó la Ley Núm. 75-2013, con el único objetivo de derogar el Plan Núm. 1-2011, supra. En la misma fecha, se aprobó la Ley Núm. 78-2013, mediante la cual se creó la Oficina del Procurador de las Personas con Impedimentos del Estado Libre Asociado de Puerto Rico. Posteriormente, en agosto de 2013, el señor Díaz Carrasquillo fue destituido de su cargo sin celebrarse una vista previa.
A raíz de estos eventos, el Procurador presentó una Demanda en el Tribunal de Distrito, en la cual alegó que se le habían violado los derechos consagrados en la Primera, Quinta y Decimocuarta Enmienda de la Constitución de Estados Unidos. En particular, alegó que había sido discriminado y hostigado por su afiliación política, lo que le impidió desempeñar sus funciones. Adujo, además, que se creó un ambiente hostil para forzarlo a que abandonara su trabajo. También, argüyó que se le violaron sus derechos constitucionales al ser despedido sin un debido proceso de ley a pesar de tener un interés propietario sobre su empleo. Finalmente, solicitó un remedio interdictal para evitar que continuaran discriminándolo y reclamó daños bajo el Art. 1802 del Código Civil de Puerto Rico, 31 LPRA see. 5141.
Luego de realizar dos vistas, el 4 y 24 de septiembre de 2013, y revisar los alegatos presentados por las partes, el Tribunal de Distrito destacó que el Gobernador no había alegado tener causa para destituir al Procurador ni que este hubiese sido negligente en el desempeño de sus funciones.(1) Asimismo, determinó que el Procurador realizaba funciones ejecutivas, así como cuasijudiciales y algunas cuasilegislativas. En cuanto a las funciones ejecutivas, el Tribunal de Distrito destacó que el Procurador estaba encargado de seleccionar personal, desarrollar programas de asistencia para las personas con impedimentos, al igual que coordinar servicios con agencias locales y federales. También estaba encargado de desarrollar un presupuesto anual, supervisar a los oficiales examinadores *103 y representar a esa población en los procedimientos que estén dentro de su jurisdicción, entre otras funciones relacionadas.(2)
Respecto a las funciones cuasijudiciales, el Tribunal de Distrito resaltó que el Procurador estaba encargado de investigar las Querellas presentadas por las personas con impedimentos, relacionadas a posibles violaciones a sus derechos por parte de agencias o entidades municipales o privadas. De igual forma, tenía la función de celebrar vistas, transar y adjudicar controversias. Asimismo, entre sus funciones estaba inspeccionar los expedientes de las agencias a las cuales investigaba, tomar juramentos e imponer multas, entre otras actividades relacionadas.(3) En lo concerniente a sus funciones cuasilegislativas, el Tribunal de Distrito destacó que el Procurador tenía el deber de asesorar a la Asamblea Legislativa sobre la legislación que considerara necesaria para desarrollar una política pública acorde con los derechos constitucionales de las personas con impedimentos, al igual que adoptar los reglamentos necesarios para implantar los programas creados de acuerdo al Plan Núm. 1-2011, supra.(4)
En consideración de lo anterior, el Tribunal de Distrito concluyó que el Procurador realizaba un híbrido de funciones ejecutivas, cuasijudiciales y cuasilegislativas. Como nuestro Tribunal no se ha expresado sobre cuál es la clasificación que se le debe otorgar a este tipo de funcionario, el Tribunal de Distrito concedió un interdicto preliminar para evitar la destitución del Procurador hasta tanto nos expresáramos sobre el particular, y mediante el recurso de certificación interjurisdiccional nos consultó las siguientes controversias de derecho exclusivo estatal:
(1) Si, por sus funciones, el Procurador para las Personas con Impedimentos de Puerto Rico, por sus funciones, disfruta de *104 un derecho limitado de propiedad para permanecer en su puesto por la duración del término fijo sujeto a “justa causa”, según definido en la ley.
(2) Si la restricción de “justa causa” impuesta al Gobernador para poder remover al peticionario de su posición se debe considerar como una interferencia a su capacidad para realizar sus deberes constitucionales y ejecutar propiamente sus obligaciones.
(3) ¿Qué factores debe considerar el Tribunal al realizar esa determinación?
(4) De existir un derecho de propiedad limitado según la ley de Puerto Rico, puede el demandante perder dicho derecho de acuerdo con la doctrina de inmunidad legislativa levantada por los demandados. (Traducción nuestra). Case 3:13-cv-01646-DRD, Document 75, pág. 12.
Luego de expedir el recurso de certificación, procedemos a contestar las preguntas certificadas.
I-H HH I—i
A. Origen y evolución de la Oficina del Procurador de las Personas con Impedimentos
Mediante la Ley Núm. 2 de 27 de septiembre de 1985 (Ley Núm. 2-1985), 3 LPRAant. see. 532 et seq.(5) la Asamblea Legislativa de Puerto Rico creó la Oficina del Procurador de las Personas con Impedimentos (OPPI). Según se desprendía del Art. 3 de esta ley, 3 LPRA ant. sec. 532b, el propósito de la OPPI era
[...] servir como instrumento de coordinación para atender y viabilizar la solución de los problemas, necesidades y reclamos de las personas con impedimentos en las áreas de la educación, la salud, el empleo y la libre iniciativa empresarial o comercial, de los derechos civiles y políticos, de la legislación social, laboral y contributiv[a], de la vivienda, la transportación, la recreación y la cultura, entre otras. Asimismo, tendrá la responsabilidad de establecer y llevar a cabo un programa *105 de asistencia, orientación y asesoramiento para la protección de las personas con impedimentos.
La legislación establecía que entre las funciones y responsabilidades de la OPPI estaba llevar a cabo programas de asesoría, orientación y servicios para las personas con impedimentos. 3 LPRA ant. sec. 532e. Asimismo, serviría como mediadora con las agencias públicas y privadas que le ofrecían servicios a esta población. Entre sus funciones también se encontraba fomentar la integración de las personas con impedimentos en diversas áreas de la comunidad. Además, uno de los deberes de la OPPI era mantener actualizadas las estadísticas sobre esta población, crear un catálogo sobre los programas dirigidos a ofrecer servicios a las personas con impedimentos y velar porque estas no fueran discriminadas. Cónsono con esto, entre sus funciones estaba orientar a esta población sobre sus derechos, establecer un programa mediante el cual pudiesen canalizar sus reclamos sobre la inacción de las agencias públicas, además de desarrollar nuevos métodos para que las personas con impedimentos se desarrollaran al máximo. Id.
Estas funciones se mantuvieron inalteradas por diecisiete (17) años. No es hasta el 2002 que la Asamblea Legislativa se vuelve a expresar sobre el particular y enmienda el anterior Art. 3 de la Ley Núm. 2-1985, supra, para establecer que la OPPI debía ser una “entidad jurídica independiente y separada de cualquier otra agencia o entidad pública [...]”. Ley Núm. 9-2002 (3 LPRA ant. sec. 532b). Según se deduce de la Exposición de Motivos de la anterior Ley Núm. 9-2002, supra, la OPPI se independizó para que ejerciera sus funciones fiscalizadoras de una manera más efectiva.
Asimismo, mediante la Ley Núm. 9-2002, supra, el legislador expresó una preocupación porque la posición del Procurador estuviese expuesta a los vaivenes políticos cada cuatro (4) años y enmendó la anterior Ley Núm. *106 2-1985, supra, para disponer que el Procurador sería nombrado con el consejo y consentimiento del Senado de Puerto Rico por un término de diez (10) años, 3 LPRA ant. see. 532b-l. Asimismo, se dispuso que previa notificación y vista, el gobernador tenía la prerrogativa de declarar vacante el puesto cuando el procurador designado fuera negligente en el desempeño de sus funciones. Al respecto, estableció como causas de destitución “los delitos contra la función pública, delito contra el erario público y delitos graves, o cualesquiera delitos menos graves que conlleven depravación moral”. íd.
Empero, con las enmiendas del 2002, el legislador no derogó o modificó las facultades que le concedieron al Procurador mediante la anterior Ley Núm. 2-1985, supra. Específicamente, al Procurador se le había delegado la función de mantener la organización interna de la OPPI, al igual que llevar a cabo todas las acciones administrativas y gerenciales necesarias para poder cumplir con los objetivos de la ley. 3 LPRA ant. sec. 532f. Asimismo, se le delegó la facultad de nombrar al personal necesario para cumplir con los propósitos de la ley, administrar el presupuesto de la OPPI y concertar los acuerdos con el Gobierno de Puerto Rico y Estados Unidos para proteger los derechos de las personas con impedimentos. Id. Anualmente, el Procurador debía rendir un Informe al Gobernador y a la Asamblea Legislativa de Puerto Rico en el que debía incluir sus logros, los programas desarrollados, los asuntos y las querellas atendidas, al igual que un análisis del manejo de los fondos asignados durante ese año.
Así las cosas, las facultades y los deberes del Procurador se mantuvieron inalterados por veintiséis (26) años. No es hasta la aprobación del Plan de Reorganización Núm. 1-2011, conocido como el Plan de Reorganización de las Procuradurías, que se incluyeron algunas modificaciones. De primera instancia, al revisar la política pública del Plan Núm. 1-2011, supra, parecería que la anterior Ley Núm. *107 2-1985, supra, sufrió cambios significativos. Sin embargo, luego de analizar la legislación con detenimiento y profundidad, nos percatamos de que esto no ocurrió. Con la aprobación de este plan se creó la Oficina de Administración de Procuradurías (OAP), bajo la cual se consolidaron las facultades, las funciones y los deberes de la Oficina del Procurador de la Salud, la Oficina del Procurador de las Personas Pensionadas y de la Tercera Edad, la Oficina del Procurador de los Veteranos y la Oficina del Procurador de las Personas con Impedimentos. La creación de esta Oficina buscaba integrar los servicios ofrecidos por todas las procuradurías, a la vez que se mantenía la independencia de criterio de cada procurador. Es decir, la OAP tenía como propósito encargarse de las funciones administrativas de las agencias, para que cada Procurador dirigiera todos sus esfuerzos a velar por la población representada por cada uno. 3 LPRA ant. Ap. XVII. Las funciones administrativas que realizaban los procuradores se delegaron a un Administrador que nombraría el Gobernador con el consejo y consentimiento del Senado por un término de cinco (5) años, esto para maximizar los • servicios ofrecidos a los ciudadanos. íd. En síntesis, el legislador dispuso lo siguiente:
Es política pública de esta Administración fortalecer y ampliar las facultades, funciones y deberes de los Procuradores de fiscalizar, educar, coordinar servicios y abogar por los derechos de las poblaciones que representan, enfatizando a su vez las responsabilidades que tienen las agencias y entidades correspondientes con las diversas poblaciones aquí mencionadas de brindarles servicios directos de calidad, justo y con el respeto que éstos ameritan. Id.
Según esta política pública, el legislador mantuvo las facultades y los deberes que le otorgaron al Procurador de las Personas con Impedimentos en la anterior Ley Núm. 2-1985, supra. No obstante, añadió que el Procurador debía asesorar al Gobernador y a la Asamblea Legislativa sobre la legislación pertinente para implantar la política *108 pública dispuesta en el Plan. Asimismo, debía asesorar a las agencias y entidades privadas con el propósito de mejorar los servicios prestados, y, además, remitir una petición de presupuesto anual a la Oficina de Gerencia y Presupuesto. Plan Núm. 1-2011, supra. Ciertamente, hay diferencia en cuanto a las disposiciones relativas a las funciones de administración y operación internas de la OAP. No obstante, las funciones cuasilegislativas y cuasijudiciales del Procurador se mantuvieron inalteradas. Consecuentemente, no hay duda de que las facultades y los deberes delegados al Procurador no sufrieron cambios significativos desde la creación de la OPPI en 1985.
Dos (2) años después, el 24 de julio de 2013, la Ley Núm. 75-2013, supra, derogó el Plan de Reorganización de las Procuradurías, porque los legisladores entendieron que solo había causado la pérdida de fondos federales y no había cumplido con el objetivo de que los servicios brindados a los ciudadanos fueran más eficientes. En esencia, el legislador justificó la derogación porque las Oficinas no se habían evaluado conforme al Consejo de Modernización de la Rama Ejecutiva, creado de acuerdo con la reorganización para, entre otras cosas, evaluar el funcionamiento de los departamentos ejecutivos. Véase Ley Núm. 182-2009 (3 LPRA see. 8821 et seq.).
Ahora bien, el mismo día en que se derogó el Plan de Reorganización de las Procuradurías, la Asamblea Legislativa aprobó la Ley Núm. 78-2013, conocida como la Ley del Procurador de las Personas con Impedimentos del Estado Libre Asociado de Puerto Rico, mediante la cual creó la Oficina del Procurador de las Personas con Impedimentos del Estado Libre Asociado de Puerto Rico. Esta ley incorporó el lenguaje que se había utilizado para enmendar el Art. 3 de la Ley Núm. 2-1985, supra. El Art. 4 de la nueva ley estableció lo siguiente:
Se crea [...] como una entidad jurídica independiente y separada de cualquier otra agencia, la cual tendrá, entre otras *109 funciones dispuestas en esta Ley, la responsabilidad de servir como instrumento de coordinación para entender y solucionar los problemas, necesidades y reclamos de las personas con impedimentos. Art. 4 de la Ley Núm. 75-2013, supra.
Además de retomar la idea de la OPPI como una entidad jurídica independiente, esta ley también sostuvo que el Procurador iba a ser nombrado por el Gobernador con el consejo y consentimiento del Senado por un término de diez (10) años. Asimismo, se incluyó al Consejo Consultivo previsto desde 1985 para asesorar al Procurador y, más importante aún, se incluyeron ad verbatim las facultades y responsabilidades que se le otorgaron a la OPPI mediante la Ley Núm. 2-1985, supra. Lo mismo sucedió con las facultades y los deberes del Procurador, ya que se mantuvieron inalterados.
Como podemos observar, desde su creación en 1985, la OPPI ha experimentado cambios administrativos, pero no así en su denominación de entidad jurídica independiente que tiene como propósito principal maximizar y fiscalizar los servicios que se otorgan a las personas con impedimentos. Sin reparos, podemos concluir que continuamente los legisladores han estado preocupados por los servicios que se le otorgan a las personas con impedimentos y han sido constantes en mantener una agencia con cierta independencia del Ejecutivo, la cual está encargada de hacer viable los reclamos contra las entidades públicas y privadas, garantizando así que a estas personas no se les violen los derechos consagrados en la Constitución de Puerto Rico. Art. II, Sec. 1, Const. ELA, LPRA, Tomo 1, ed. 2008, pág. 272.
B. Doctrina de Separación de Poderes
 Nuestro sistema republicano de gobierno está sustentado en la separación de poderes entre las tres (3) ramas de gobierno: la Ejecutiva, la Legislativa y la Judicial. Art. I, Sec. 2, Const. ELA, supra, pág. 271. Al respecto, hemos expresado que más que a una regla técnica de dere *110 cho, la Doctrina de Separación de Poderes está invariablemente atada a nuestra comunidad política. AAR, Ex parte, 187 DPR 835, 855 (2013). Esto, porque la finalidad de esta doctrina es mantener la colaboración entre las tres (3) ramas de gobierno, sin que una domine o interfiera indebidamente con la otra. Colón Cortés v. Pesquera, 150 DPR 724, 750 (2000). Su propósito ulterior es proteger la libertad de los ciudadanos y garantizar la independencia de cada una de las ramas de gobierno. íd.
En síntesis, no se pretende eliminar la interacción entre las ramas, sino que mediante un sistema de pesos y contrapesos, las actuaciones de una rama no causen detrimento a otra. “[Significa que la función judicial sólo puede ser llevada a cabo por la Rama Judicial, y de la misma manera, que labores no judiciales deben ser dejadas para la correspondiente actuación de las otras ramas”. (Enfasis suprimido). Colón Cortés v. Pesquera, supra, pág. 752.
C. Debido proceso de ley
El Art. II, Sec. 7 de nuestra Constitución establece que ninguna persona será privada de su libertad o propiedad sin un debido proceso de ley. Const. ELA, supra, pág. 296. Véanse, además: Emdas. V y XIV, Const. EE. UU., LPRA, Tomo 1. Esta protección se manifiesta tanto en su vertiente sustantiva como en la procesal. En la primera se examina la validez de una ley al amparo de la Constitución, mientras que en la vertiente procesal se consideran las garantías mínimas que el Estado debe resguardar a un individuo al afectar su vida, propiedad o libertad. Picorelli López v. Depto. de Hacienda, 179 DPR 720, 735-736 (2010); Domínguez Castro et al. v. E.L.A. I, 178 DPR 1, 46 (2010); Hernández v. Secretario, 164 DPR 390, 394-395 (2005); Rivera Santiago v. Srio. de Hacienda, 119 DPR 265, 273 (1987).
De acuerdo con estas disposiciones, lógicamente hemos reconocido que el debido proceso de ley en su ver *111 tiente procesal se puede invocar solamente cuando el Estado atenta contra el interés individual de libertad o el interés propietario de una persona. González Segarra et al. v. CFSE, 188 DPR 252, 278 (2013); Calderón Otero v. C.F.S.E., 181 DPR 386, 398 (2011). Por consiguiente, de existir este interés, entonces procede que el Estado otorgue las garantías siguientes: “(1) notificación adecuada del proceso; (2) proceso ante un juez imparcial; (3) oportunidad de ser oído; (4) derecho a contrainterrogar a los testigos y examinar la evidencia presentada en su contra; (5) tener asistencia de abogado, y (6) que la decisión se base en el expediente”. González Segarra et al. v. CFSE, supra, pág. 279, citando a Vázquez González v. Mun. de San Juan, 178 DPR 636 (2010). En fin, lo primordial es asegurar que las actuaciones del Estado sean justas e imparciales. E.L.A. et al. v. Molina Figueroa, 186 DPR 461, 471 (2012); Rivera Rodríguez & Co. v. Lee Stowell, etc., 133 DPR 881, 887-888 (1993).
Cónsono con estas garantías, hemos dispuesto que “un empleado en el servicio público tiene un reconocido interés en la retención de su empleo, si dicho interés está protegido por ley o cuando las circunstancias crean una expectativa de continuidad. Es la presencia de estos factores lo que determina la existencia de un interés propietario”. Domínguez Castro et al. v. E.L.A. I, supra, pág. 69. Véanse, además: Díaz Martínez v. Policía de P.R., 134 DPR 144, 148 (1993), citando a Orta v. Padilla Ayala, 131 DPR 227, 241 (1992); Morales Narváez v. Gobernador, 112 DPR 761, 767 (1982); Pierson Muller I v. Feijoó, 106 DPR 838, 852 (1978). Véase, también, Board of Regents v. Roth, 408 US 564, 577 (1972). Asimismo, hemos establecido que cuando a un empleado lo nombran por un periodo de tiempo determinado, este tiene una legítima expectativa de retención durante ese tiempo. S.L.G. Giovanetti v. E.L.A., 161 DPR 492, 510 (2004); Depto. Recs. Naturales v. Correa, 118 DPR 689, 697 (1987).
*112 En estos casos, también es necesario que al empleado se le confiera una vista informal en la cual se le escuche y resguarden las garantías antes descritas. González Segarra et al. v. CFSE, supra; Torres Solano v. P.R.T.C., 127 DPR 499 (1990). Es decir, mientras un empleado tiene un interés propietario sobre su empleo, no puede ser removido sin que se demuestre justa causa.
D. Poder de destitución del Primer Ejecutivo
El Poder Ejecutivo de nuestro gobierno está concentrado en el Gobernador de Puerto Rico. Art. IV, Sec. 1, Const. ELA, supra, pág. 402. Para poder descargar sus funciones, en la Constitución se dispuso que a este lo asistirán los secretarios de gobierno, quienes serán nombrados con el consejo y consentimiento del Senado. Art. IV, Sec. 5, Const. ELA, supra, pág. 408. Según estas disposiciones, se le concedió la facultad expresa para “[n]ombrar, en la forma que se disponga por esta Constitución o por ley, a todos los funcionarios para cuyo nombramiento esté facultado”. Art. IV, Sec. 4, Const. ELA, supra, pág. 403. Empero, la Constitución no contiene una disposición expresa sobre la facultad del gobernador para destituir empleados y cuáles, si algunas, deberían ser las limitaciones de esa destitución con relación a las funciones que realizan los empleados gubernamentales. La única disposición relacionada es la relacionada con los Procesos de residencia. Art. Ill, Sec. 21, Const. ELA, supra, pág. 401.
Ahora bien, al analizar con detenimiento el Diario de Sesiones de la Convención Constituyente de Puerto Rico nos percatamos de la discusión que se suscitó ante la posibilidad de que la Asamblea Legislativa pudiera variar el término de duración del cargo de los secretarios de gobierno, inmiscuyéndose así con la Rama Ejecutiva. 3 Diario de Sesiones de la Convención Constituyente 2268-2271 (1952). Ante la preocupación de que esto no fuera cónsono con el sistema republicano de gobierno que se pretendía perpetuar mediante la Constitución, el delegado, señor Gu *113 tiérrez Franqui, atendió la controversia y propuso que no se debía establecer un término de duración para los cargos de los secretarios de gobierno. Para justificar su propuesta, hizo un recuento de cómo se atendió el problema en Estados Unidos.
Luego de exponer la normativa dispuesta en Myers v. United States, 272 US 52 (1926), y en Humphrey’s Executor v. U.S., 295 US 602 (1935), cincuenta y cuatro (54) delegados votaron a favor de la propuesta. Posteriormente, este Tribunal se expresó por primera vez sobre el particular en el 2005.
En Guzmán v. Calderón, 164 DPR 220, 224 (2005), contestamos en la negativa una certificación interjurisdiccional emitida por el Tribunal de Distrito con relación a si el requisito de justa causa para la destitución de un integrante de la Junta de Directores de la Corporación de Puerto Rico para la Difusión Pública infringía con las facultades constitucionales del Gobernador.
Esta pregunta surgió luego de que la entonces gobernadora, Sila M. Calderón, destituyera al Sr. Arturo Guzmán Vargas por insubordinación y este instara una Demanda en la cual alegó que se le habían violado sus derechos civiles. En síntesis, concluimos que este no realizaba funciones puramente ejecutivas, sino que le habían delegado funciones cuasilegislativas dentro de una agencia con personalidad jurídica independiente, lo que justificaba las restricciones impuestas al poder de destitución del Gobernador. Por consiguiente, el requisito de justa causa requerido para la destitución de este funcionario no infringía las facultades del Gobernador para descargar sus funciones ejecutivas.
En ese mismo año, el 17 de junio de 2005, este Tribunal nuevamente acogió una certificación del Tribunal de Distrito. Véase Santana v. Gobernadora, 165 DPR 28 (2005). En específico, contestamos que al amparo de la Constitución de Puerto Rico, la Gobernadora tenía la facultad para destituir a la Directora Ejecutiva del Consejo de *114 Desarrollo Ocupacional y Recursos Humanos. Concluimos que la Directora Ejecutiva realizaba actividades dirigidas a establecer la política pública de Puerto Rico; por consiguiente, sus funciones eran puramente ejecutivas, lo cual no le otorgaba un interés propietario sobre su empleo. Cónsono con lo anterior, el término de cuatro (4) años impuesto en la ley era puramente directivo, hecho que no impedía la remoción de la funcionaría pública. Id., págs. 62-63.
En ambos casos, hicimos referencia a lo dispuesto en Myers v. United States, supra, y en Humphrey’s Executor v. U.S., supra. No obstante, y para ser cónsonos con lo adoptado por los delegados de nuestra Asamblea Constituyente, detallamos sobre cómo la doctrina había evolucionado en Estados Unidos. Así, destacamos cómo lo dispuesto en Humphrey’s Executor v. U.S., supra, fue reiterado por el Tribunal Supremo en Wiener v. United States, 357 U.S. 349 (1958). Asimismo, recurrimos a lo establecido posteriormente en Morrison v. Olson, 487 US 654 (1988), donde se dispuso que el análisis sobre la facultad de destitución que se tiene sobre un empleado no se puede limitar al tipo de función que este realiza. A pesar de que esto es esencial para el análisis, es imprescindible evaluar si las restricciones que impuso la Asamblea Legislativa inciden en la capacidad del Presidente de cumplir y hacer cumplir las leyes. Es decir, es imperativo que la determinación no violente la separación de poderes que caracteriza nuestro sistema de gobierno.
En síntesis, y reconociendo que hay cierta tensión entre lo resuelto en Humphrey’s Executor v. U.S., supra, y en Morrison v. Olson, supra,(6) al momento de evaluar el poder de destitución del primer ejecutivo se tendrá que considerar un híbrido de lo resuelto en ambos casos. Es decir, en primer lugar, se deberá determinar caso a caso la *115 naturaleza de las funciones que realiza el empleado que va a ser destituido de su cargo. Al determinar si las funciones de un empleado son ejecutivas, cuasilegislativas o cuasijudiciales, estamos atendiendo la normativa propuesta en Humphrey’s Executor v. U.S., supra.(7)
Esto implica que únicamente cuando un empleado gubernamental realiza funciones ejecutivas, es de libre remoción por el Gobernador. Es decir, cuando el empleado interviene en la formulación de política pública, que es una función de la Rama Ejecutiva, el Gobernador lo puede remover. Empero, en caso de que un empleado realice funciones primordialmente cuasilegislativas o cuasijudiciales, al gobernador se le podrá requerir que demuestre justa causa para destituirlo. De lo contrario, estaríamos permitiendo una violación del principio político de separación de poderes. Así, en estos casos, la Asamblea Legislativa le podrá imponer restricciones al Gobernador para poder destituir a estos empleados. Sin embargo, este análisis por sí solo no es suficiente. Corresponde analizar la totalidad de las circunstancias para determinar si, además, independientemente de las funciones que realiza el funcionario, las restricciones que haya impuesto la Asamblea Legislativa inciden en la facultad del gobernador para descargar sus funciones ejecutivas.
*116 E. Doctrina de la Inmunidad Legislativa
La Constitución de Puerto Rico establece que “[1] a Asamblea Legislativa tendrá facultad para crear, consolidar o reorganizar departamentos ejecutivos y definir sus funciones”. Art. Ill, Sec. 16, Const. ELA, supra, pág. 396. Asimismo, el Art. Ill, Sec. 14 de nuestra Constitución dispone que “todo miembro de la Asamblea Legislativa gozará de inmunidad parlamentaria por sus votos y expresiones en una u otra cámara o en cualquiera de sus comisiones”. Id., pág. 392.
Al interpretar esta última disposición constitucional, en Romero Barceló v. Hernández Agosto, 115 DPR 368, 379 (1984), especificamos que la protección se extendía a las actividades legislativas legítimas. Es decir, a “los procesos de deliberación, comunicación, investigación, e información y actos necesarios para el desarrollo del proceso legislativo”. Vélez Ramírez v. Colberg Ramírez, 117 DPR 873, 876 (1986). Lo determinante para otorgar esta protección es la “naturaleza del acto y su relación con el proceso deliberativo y de votación inherente a las funciones parlamentarias”. Silva v. Hernández Agosto, 118 DPR 45, 60 (1986). Véase, además, Acevedo Vilá v. Aponte Hernández, 168 DPR 443, 455 (2006). Tanto es así, que hemos concluido que la doctrina cobija a los ayudantes de los legisladores, pues lo importante no es quién lleva a cabo la actividad, sino el acto en sí mismo. Silva v. Hernández Agosto, supra, pág. 60. Por otra parte, el Tribunal Supremo federal ha reconocido que la Doctrina de Inmunidad cobija a funcionarios fuera de la Asamblea Legislativa, en tanto estén realizando funciones legislativas. Bogan v. Scott-Harris, 523 US 44, 55 (1998).
La inmunidad legislativa o parlamentaria tiene dos (2) funciones: una sustantiva y otra evidenciaría. Es decir, no tan solo protege a los miembros de la Asamblea Legislativa de responsabilidad civil y criminal por actúa *117 ciones legítimas dentro de los procesos legislativos, sino que tampoco permite que estos sean parte de una acción civil relacionada con estas actuaciones, ni que testifiquen al respecto. Pres. del Senado, 148 DPR 737, 769 (1999). Véase, además, In re Figueroa Vivas, 149 DPR 557 (1999). “Limitarle a un miembro de la Asamblea Legislativa su función o prerrogativa de informar, fiscalizar o debatir asuntos de interés público necesariamente lacera las prerrogativas constitucionales de ese legislador causándole un daño real”. Asoc. Fotoperiodistas v. Rivera Schatz, 180 DPR 920, 963 (2011).
Cónsono con estas disposiciones, los motivos que subyacen la actuación legislativa están completamente fuera del ámbito de revisión judicial. Pres. del Senado, supra, pág. 769; Romero Barceló v. Hernández Agosto, supra, págs. 379-380. De lo contrario, además de validarse una interferencia indebida de la Rama Judicial en los quehaceres de la Asamblea Legislativa, la inmunidad perdería todo su valor. Es fundamental destacar que el propósito de esta doctrina es precisamente preservar la independencia de la Rama Legislativa y así salvaguardar la separación de poderes. Romero Barceló v. Hernández Agosto, supra, pág. 379.
Empero, hemos sido persistentes en reiterar que las actuaciones de la Asamblea Legislativa no están exentas de revisión judicial. Es decir, la llamada inmunidad legislativa no es absoluta. “Corresponde a los tribunales, y no al Poder Legislativo, definir sus contornos”. Vélez Ramírez v. Colberg Toro, supra, pág. 876, citando a Romero Barceló v. Hernández Agosto, supra; Silva v. Hernández Agosto, supra, pág. 59.
Como ya hemos mencionado, desde Silva v. Hernández Agosto, supra, reconocimos que no todo acto legislativo está protegido, siendo imprescindible que distinga *118 mos entre un acto legislativo y una acción no legislativa.(8) Por consiguiente, al momento de considerar la aplicación de la inmunidad parlamentaria, tenemos que ser bien cautelosos al establecer cuál es el acto que estamos protegiendo. Esto, debido a que la inmunidad absoluta solamente aplica cuando el acto está enmarcado dentro de la capacidad legislativa. Como corolario, se ha concluido que al Presidente lo cobija esta inmunidad cuando firma o veta una ley aprobada por el Congreso. Es decir, este acto está cobijado por absoluta inmunidad debido a que es considerado parte del proceso legislativo. Torres Rivera v. Calderon Serra, 412 F.3d 205, 213 (2005), citando a Smiley v. Holm, 285 US 355, 372-373 (1932); Women’s Emergency Network v. Bush, 323 F.3d 937, 950 (11mo Cir. 2003)); Bogan v. Scott-Harris, supra, pág. 55. No obstante, las acciones que se toman para implantar la legislación no están cobijadas por la inmunidad legislativa, sino que se deben evaluar según la inmunidad cualificada. Torres Rivera v. Calderon Serra, supra, pág. 214, citando a Scheuer v. Rhodes, 416 US 232 (1974).(9)
*119 Cónsono con estas disposiciones, varias jurisdicciones han diferenciado un acto legislativo de uno administrativo con el propósito de otorgarle inmunidad absoluta solamente al primero. Para esto, han establecido que es preciso abordar la naturaleza de los hechos que subyacen el acto en controversia. Si estos sucesos están basados en generalizaciones hechas en relación con la política pública adoptada, se consideran legislativos. Ahora bien, si los hechos que subyacen son más específicos, es decir, están relacionados a individuos o situaciones particulares, se consideran administrativos. Asimismo, se ha reconocido que se puede distinguir entre una acción administrativa y una legislativa mediante la particularidad del impacto de la acción. Es decir, cuando la acción involucra aplicar una política general, podemos establecer que es legislativa. Sin embargo, cuando va dirigida a afectar a un ciudadano en particular, se considera administrativa. Cutting v. Muzzey, 724 F.2d 259, 261 (1er Cir. 1984). Véanse, además: Acevedo-Cordero v. Cordero-Santiago, 958 F.2d 20, 23 (1er Cir. 1992); Orange Lake Associates, Inc. v. Kirkpatrick, 21 F.3d 1214 (2do Cir. 1994). Esta distinción entre un acto legislativo y uno administrativo también la adoptó el Tercer Circuito en Fowler-Nash v. Democratic Caucus of Pa. House of Representatives, 496 F.3d 328 (3er Cir. 2006). Para esto, además de considerar las expresiones del Primer Circuito en Cutting v. Muzzey, supra, el Tercer Circuito destacó cómo el análisis es cónsono con lo expuesto por el Tribunal Supremo de Estados Unidos en Forrester v. White, 484 US 219, 227 (1988).(10) Fowler-Nash v. Democratic Caucus of *120 Pa. House of Representatives, supra, págs. 332-333. El resultado de esta teoría es que puede ser que “ ‘un legislador no reciba inmunidad absoluta por acciones que son administrativas en su naturaleza y, por el contrario, un oficial ejecutivo reciba inmunidad absoluta por acciones que son legislativas en su naturaleza’ ”. (Traducción nuestra). Miles-Un-Ltd., Inc. v. Town of New Shoreham, R I, 917 F. Supp. 91, 99 (D. NH 1996).
A continuación esbozaremos algunas determinaciones a las que se han llegado aplicando la distinción entre un acto legislativo y uno administrativo. En Negron-Gaztambide v. Hernandez-Torres, 35 F.3d 25, 28 (1er Cir. 1994), el Primer Circuito concluyó que la destitución de la demandante —una bibliotecaria de la Oficina de Servicios Legislativos— fue un acto administrativo y, por consiguiente, al demandado no lo cobijaba la inmunidad legislativa absoluta, por lo cual procedía la Demanda según el 42 USCA see. 1983.(11) Para sustentar esta conclusión, el Primer Circuito hizo referencia a Forrester v. White, supra, en la que el Tribunal Supremo federal determinó que un juez estatal actuó en su capacidad administrativa cuando destituyó a un subordinado. Por otra parte, en Roberson v. Mullins, 29 F.3d 132 (4to Cir. 1994), el Cuarto Circuito se enfrentó a la destitución de un miembro de una junta de directores de un county por su afiliación política. El tribunal entendió que la destitución no estaba relacionada con el proceso legislativo; por consiguiente, la junta de directores no actuó dentro de sus capacidades legislativas, siendo inaplicable *121 la inmunidad legislativa. Para ejemplos adicionales, véanse: Gross v. Winter, 876 F.2d 165, 172-173 (Cir. DC 1989); Rateree v. Rockett, 852 F.2d 946 (7mo Cir. 1988).
De acuerdo con todas estas disposiciones, podemos concluir que para aplicar la inmunidad legislativa tenemos que considerar la naturaleza del acto en controversia, pues solamente está protegido aquel dirigido a establecer política pública y que es cónsono con los procesos legislativos. No podemos otorgar la misma protección a aquellos actos cuya naturaleza es administrativa y van dirigidos a afectar a un individuo en particular.(12)
F. La abolición de un cargo y posterior creación del mismo como subterfugio de la Asamblea Legislativa para destituir a un empleado
Por otra parte, los demandados aducen reiteradamente que la derogación de la Ley Núm. 75-2013, supra, y la subsiguiente aprobación de la Ley Núm. 78-2013, supra, validan la actuación del Gobernador de remover al procurador en cumplimiento con la ley y no destituirlo. Para esto, vehementemente citan lo resuelto por esta Curia en Gómez v. Negrón, 65 DPR 305 (1945). Particularmente, en lo concerniente a cuando un incumbente acepta un cargo creado por la Asamblea Legislativa, lo hace entendiendo que lo pue *122 den abolir en cualquier momento. Por consiguiente, si esto ocurre, no se puede alegar que al funcionario se le está privando de algún derecho constitucional. íd., pág. 312. Ahora bien, para poder hacer un análisis responsable de estas expresiones, es menester reconocer que las mismas fueron hechas luego de que estableciéramos que este derecho está circunscrito a las limitaciones de la anterior Ley de Servicio Civil. Específicamente, dispusimos lo siguiente:
Los casos resueltos por esta Corte sosteniendo la doctrina de que la abolición de un cargo y la creación de otro con distinto nombre pero con los mismos deberes y obligaciones, no priva al incumbente del primero del derecho a ser designado para el segundo, han sido casos no sólo de cargos o empleos dentro del Servicio Civil Clasificado, sino que los hechos han demostrado que el funcionario o empleado había adquirido un status permanente en dicho Servicio. Véanse Cruz v. Buscaglia, supra; Rosario v. Cuevas, Comisionado, 60 DPR 470; Géigel Polanco v. Rivera Martínez, 48 DPR 124 y Romero v. Gore, 46 DPR 408.
Con las limitaciones que la Ley de Servicio Civil contiene para la protección de aquellos funcionarios o empleados que tengan reconocido un status permanente dentro del Servicio Clasificado, no existe, pues, lo que el peticionario califica de su “status como funcionario público con derecho a permanecer en su puesto” por un término fijo, si la Legislatura ha tenido a bien abolir su puesto. (Enfasis suprimido). Gómez v. Negrón, supra, págs. 308-309.
Mediante estas expresiones, el Tribunal reconoció y validó lo dispuesto en Rosario v. Cuevas, Comisionado, 60 DPR 470 (1942). “[U]n mero cambio de nombre no es por sí solo suficiente para crear un nuevo cargo y abolir el que existía anteriormente. Cuando se suprime un cargo y enseguida se crea otro bajo una nueva designación, pero con iguales deberes que el anterior, las cortes amparan al funcionario perjudicado, por entender que el cambio se ha hecho con el propósito de evadir las leyes del Servicio Civil”.(13) íd., págs. 476-477. Esta norma ha sido reiterada *123 por esta Curia aún después de aprobada nuestra Constitución. Véanse: Caballero v. Romero Barceló, 103 DPR 1, 4-5 (1974); González v. Gobierno Municipal, 101 DPR 755, 759 (1973); Centeno Rivera v. Pacheco de Algarín, 94 DPR 528, 533 (1967); Figueroa v. López, Alcalde, 89 DPR 474, 481 (1963). Por consiguiente, este Tribunal ha sido consecuente en rechazar actuaciones de la Asamblea Legislativa dirigidas únicamente a destituir a un funcionario de su cargo.
Es de acuerdo con toda esta normativa que resolvimos Gómez v. Negrón, supra. Es precisamente por esta razón que en aquella ocasión analizamos si el cargo de fiscal del Tribunal Supremo que fue creado era el mismo que el abolido por la Asamblea Legislativa. Luego de analizar ambos cargos, concluimos que la forma y el término de los nombramientos eran fundamentalmente diferentes. íd., págs. 310-311. Por consiguiente, se determinó que cuando existe diferencia en la naturaleza de los cargos, no se puede concluir que el cargo anterior no fue abolido. Luego de llegar a esta conclusión y determinar que la Legislatura actuó dentro del ámbito de sus funciones, concluimos que el demandado no tenía el deber ministerial de nombrar al peticionario para el nuevo cargo creado. Es menester destacar que en todo este análisis fuimos muy cautelosos al garantizar que esto no implicaba que estábamos inmiscuyéndonos con los motivos que tuvo esta rama de gobierno para tomar su determinación, pues esto ciertamente constituiría una violación a la separación de poderes que sustenta nuestro sistema de gobierno. íd., pág. 314.
Por lo tanto, reiteramos que un funcionario público no puede reclamar un interés propietario sobre un cargo que ocupaba cuando este ha sido eliminado por la *124 Asamblea Legislativa. Esto aplica siempre y cuando la actuación no sea un subterfugio para destituir al empleado de su cargo, lo cual sucede cuando, acto seguido a la derogación, se crea otro cargo cuyos deberes y obligaciones son iguales al anterior, pero con otro nombre.
IV
Luego de analizar el estado de derecho aplicable, nos corresponde atender las preguntas específicas ante nuestra consideración. Al analizar cuidadosamente los deberes delegados al Procurador, no es correcto concluir que este realizaba funciones estrictamente ejecutivas, siendo imposible otorgarle el mismo tratamiento que al Director Ejecutivo del Consejo de Desarrollo Ocupacional en Santana v. Gobernadora, supra. Tampoco podemos concluir que el procurador realizaba funciones cuasilegislativas o cuasijudiciales exclusivamente. A contrario sensu, como bien determinó el Tribunal de Distrito, nos estamos enfrentando a un empleado con funciones híbridas.
Como vimos, entre las funciones que la Asamblea Legislativa le delegó al Procurador estaba no tan solo colaborar con el Primer Ejecutivo en el desarrollo de programas para optimizar los servicios brindados a las personas con impedimentos, sino que de las leyes aprobadas se deduce la intención de crear una agencia con cierta independencia del Poder Ejecutivo con la capacidad de fiscalizar estos servicios. Como ya hemos descrito, una de las funciones principales del procurador es investigar y llevar reclamaciones por actos violatorios en contra de esta población, tanto en contra agencias públicas como privadas.(14)
Este rol es tan primordial que la Asamblea Legislativa le otorgó al cargo un término de diez (10) años de duración con el propósito de que el Procurador pudiese ejercer sus *125 funciones sin las presiones y los vaivenes políticos que afectan a los cargos que están circunscritos al término de nombramiento de un gobernante. Ciertamente, este objetivo se cumple al otorgar un término de nombramiento mayor al de la incumbencia de un gobernante. Por consiguiente, se dispuso que este solo se podía destituir luego de que se le otorgara notificación y vista por haber sido negligente en el desempeño de sus funciones, haber omitido el cumplimiento de su deber o incurrido en conducta impropia.
Además, según ha destacado el Tribunal de Distrito, el Art. 52(c) del anterior Plan Núm. 1-2011, supra, le otorgaba el beneficio al Procurador de, a su discreción, acogerse a la Ley de los Sistemas de Retiros de los Empleados Públicos, 3 LPRA ant. Ap. XVII, lo cual es un beneficio que se otorga a los empleados de carrera. Asimismo, según surge de la vista realizada en el Tribunal de Distrito, entre las funciones de este procurador estaba implantar la Ley para las Personas con Impedimentos (ADA, por sus siglas en inglés), 42 USCAsec. 12101 et seq.,(15) la cual tiene como norte salvaguardar los derechos de las personas con impedimentos. Además de las funciones de fiscalización exigidas por esta ley, según se infiere de la transcripción de la vista y ha sido reconocido por el Tribunal de Distrito, los fondos asignados a la OPPI provienen tanto del fondo general estatal como de fondos federales, los cuales el procurador puede solicitar sin el aval del gobernador de Puerto Rico.(16)
Es a raíz de la naturaleza de estas facultades y las descritas anteriormente que podemos concluir que el procurador es un empleado gubernamental cuyas funciones son híbridas. Pero, las cuasijudiciales tienen mayor peso que las ejecutivas, lo cual hace meritorio que para su destitución se demuestre justa causa. Es decir, el Procurador no es un empleado de libre remoción, sino que es acreedor de un *126 interés propietario durante el término de su cargo.(17) Consecuentemente, el Gobernador está sujeto a las restricciones impuestas por la Asamblea Legislativa.
Al analizar la totalidad de las circunstancias entendemos que estas restricciones no violan la separación de poderes ni inciden en la capacidad del Gobernador de cumplir y hacer cumplir las leyes. A pesar de que este funcionario colabora con el ejecutivo, estas no son sus únicas funciones. Por el contrario, la OPPI se creó como un ente fiscalizador independiente con el propósito de salvaguardar los intereses de la población de impedidos de nuestro País. Asimismo, entendemos que el Gobernador retiene suficiente poder para remover al Procurador mediante las causales de destitución dispuestas por ley, las cuales permiten que este sea destituido si actúa fuera del ámbito que le fue establecido en la ley.
Habiendo contestado esta interrogante en la afirmativa, nos corresponde concluir si, según la normativa enunciada, el Procurador pierde su derecho propietario por la inmunidad legislativa, según alegan los demandados y certifica el Tribunal de Distrito. En particular, arguyen que el Procurador no fue destituido, sino que su cargo dejó de existir por gracias a una actuación legítima de la Asamblea Legislativa. Sin duda alguna, este planteamiento no pro-cede en derecho.
En primer lugar, como bien hemos delimitado, la destitución de un empleado particular constituye un acto de naturaleza administrativa, no una actividad legislativa legítima, y no lo cobija la inmunidad absoluta. Según se deduce de la situación de hechos ante nuestra consideración, al crearse la “nueva” Oficina del Procurador de las Personas con Impedimentos del Estado Libre Asociado de Puerto Rico solo se destituyó al Procurador, no así a los restantes *127 sesenta y ocho (68) empleados que allí trabajaban. Los demandados alegan que esto no es óbice para concluir que al Procurador lo trataron diferente a los demás empleados, debido a que este no estaba cobijado bajo la Ley Núm. 184-2004 (3 LPRA see. 1461 et seq.), conocida como Ley para la Administración de los Recursos Humanos en el Servicio Público del Estado Libre Asociado de Puerto Rico. Este argumento no nos persuade, pues como ya hemos concluido, el Procurador también tenía un interés propietario sobre su cargo durante el término de su nombramiento. Por consiguiente, concluimos que la destitución del Procurador no fue un hecho generalizado, cónsono con la implantación de política pública, sino que fue un acto en contra de un individuo particular, por lo que no está cobijado bajo la inmunidad absoluta.
Además, desde mediados del siglo pasado hemos sostenido firmemente que este Tribunal no va a tolerar y, mucho menos ignorar, cuando la Asamblea Legislativa utiliza los poderes que se le delegan mediante nuestra Constitución como un subterfugio para no respetar el derecho propietario de un funcionario gubernamental. Esto es precisamente lo que sucedió en el caso de autos. La derogación del Plan Núm. 1-2011, supra, y consigo la Oficina del Procurador de las Personas con Impedimentos y la inmediata aprobación de la Ley Núm. 78-2013, supra, con la cual se creó la Oficina del Procurador de las Personas con Impedimentos del Estado Libre Asociado de Puerto Rico, constituye precisamente la práctica que hemos rechazado. Tal como discutimos anteriormente, no podemos concluir que con la aprobación de la Ley Núm. 78-2013, supra, se abolió el cargo del Procurador y se creó uno nuevo; por el contrario, se sostuvieron las funciones de la OPPI al igual que los deberes y las obligaciones del Procurador.
Siendo así, es forzoso concluir que la naturaleza del cargo no fue alterada; simplemente se le cambió el nombre, pero los deberes y las obligaciones se mantuvieron inalterados. Consecuentemente, el Procurador no perdió su interés pro *128 pietario porque la Asamblea Legislativa aboliera su cargo. Es decir, esta actuación no priva al Procurador de mantenerse ejerciendo sus funciones en la nueva Oficina, pues se ha mantenido la naturaleza de la anterior, lo que en última instancia implica que el cargo no fue abolido.
V
Por los fundamentos expuestos anteriormente, resolve-mos que el Procurador solo puede ser destituido por las causales dispuestas en ley. Es decir, posee un derecho propietario limitado al término fijo de duración de su nombramiento.
Además, concluimos que la destitución del Procurador es un acto administrativo que no está cobijado por la inmunidad legislativa absoluta. Asimismo, el Procurador preserva su derecho propietario aun ante la actuación de la Asamblea Legislativa de derogar la Oficina del Procurador de las Personas con Impedimentos e inmediatamente crear la Oficina del Procurador de las Personas con Impedimentos del Estado Libre Asociado de Puerto Rico.

Se dictará Sentencia de conformidad.

El Juez Asociado Señor Martínez Torres emitió una opinión particular de conformidad, a la que se unió el Juez Asociado Señor Kolthoff Caraballo. La Jueza Presidenta Señora Fiol Matta disintió mediante una opinión escrita. La Juez Asociada Señora Rodríguez Rodríguez disintió mediante una opinión escrita.
Opinión particular de conformidad emitida por el
Juez Asociado Señor Martínez Torres, a la cual se unió el Juez Asociado Señor Kolthoff Caraballo.
Estoy conforme con la decisión del Tribunal. Sin embargo, el desarrollo de este caso en los tribunales federales *129 después que emitimos el auto de certificación a petición del Tribunal Federal para el Distrito de Puerto Rico me lleva a hacer unas expresiones breves.
El propósito de una certificación interjurisdiccional es que el tribunal federal cuente con una determinación cierta del derecho local por parte del máximo foro judicial estatal. Esto permite que ese foro estatal delimite los linderos de su derecho y propicie así una interrelación armoniosa entre ambas jurisdicciones que conviven en el mismo suelo. Guzmán v. Calderón, 164 DPR 220 (2005). La certificación interjurisdiccional permite “preservar y respetar la función prístina de las cortes estatales de interpretar y formular el derecho de los estados”. Pan Ame. Comp. Corp. v. Data Gen. Corp., 112 DPR 780, 785 (1982). Este mecanismo provee a las partes una alternativa más eficiente, rápida y económica que la abstención Pullman, que obligaba a las partes a litigar un asunto de ley estatal a través de toda la jerarquía de tribunales estatales, desde la primera hasta la última instancia, y solo entonces se reanudaban los procedimientos en la corte federal. Railroad Comm’n v. Pullman Co., 312 US 496 (1941). Véase Bellotti v. Baird, 428 US 132 (1976).
En este caso, el Tribunal de Distrito Federal para el Distrito de Puerto Rico nos solicitó mediante certificación que le contestemos, en síntesis, si el demandante, Iván Díaz Carrasquillo, tiene por virtud de su nombramiento de diez años a la posición de Procurador de las Personas con Impedimentos, un derecho a permanecer en el cargo hasta que se venza ese término, salvo que sea removido por justa causa como disponía el estatuto según el cual se le nombró. De no tenerlo, la Asamblea Legislativa podría, arguy endo, eliminar el cargo mediante nueva legislación. El Estado Libre Asociado de Puerto Rico, parte demandada, sostiene que eso íue lo que sucedió aquí y que las Leyes Núms. 75 y 78 de 2013 eliminaron el cargo del demandante y crearon uno nuevo, al cual el gobernador puede nominar otra persona.
*130 Pendiente de resolver la certificación ante nos, el Tribunal Federal de Apelaciones para el Primer Circuito emitió un dictamen en el cual revocó el injunction que mantenía al demandante en su puesto. El foro apelativo federal concluyó, citando una decisión nuestra, que el demandante Díaz Carrasquillo no tiene derecho al remedio interdictal porque la Asamblea Legislativa puede eliminar su puesto derogando la ley que lo creó. Díaz-Carrasquillo v. GarcíaPadilla, No. 13-2277, Slip Opinion, (1er Cir., 16 de abril de 2014). En otras palabras, el tribunal federal apelativo interpretó nuestro derecho para revisar el injunction preliminar emitido y, al así proceder, contestó la interrogante que nosotros aceptamos resolver a petición del Tribunal de Distrito Federal. La opinión del Tribunal Federal de Apelaciones para el Primer Circuito no es final y firme, pues está pendiente una solicitud de reconsideración (rehearing) en bañe.
Siempre hemos sido deferentes con los foros federales al atender peticiones de certificación interjurisdiccional. Lo hacemos porque buscamos hacer efectivo un mecanismo eficiente y económico para que las partes tengan una interpretación concluyente de los asuntos no resueltos de la ley local que se plantean en los casos ante el foro federal. En fin, nuestro norte ha sido cooperar con la que consideramos una jurisdicción hermana, para beneficio de las personas que acuden allí en busca de la reparación de un agravio.
En esta ocasión, sin embargo, no se nos.trató como hermanos. Se ignoró nuestra intervención y no hubo deferencia hacia nuestro rol como intérpretes máximos del derecho local, contrario al propósito mismo del mecanismo de certificación. El foro apelativo federal procedió a interpretar nuestro derecho local en cuanto a la creación y abolición de agencias y posiciones estatales, a pesar que la deferencia aconsejaba esperar. Como se advierte de nuestra decisión, estamos ante un asunto no resuelto antes, contrario a lo que concluyó el Tribunal Federal de Apelaciones. “ ‘Speculation by a federal court about the meaning of a state statute in *131 the absence of prior state court adjudication is particularly gratuitous when [...] the state courts stand willing to address questions of state law on certification from a federal court’ Arizonans for Official English v. Arizona, 520 US 43, 79 (1997), citando a Brockett v. Spokane Arcades, Inc., 472 US 491, 510 (1985), opinión concurrente de la Juez O’Connor.
El federalismo y el respeto que merecen los procesos judiciales estatales exigen que los tribunales federales se abstengan de pasar juicio sobre cuestiones de derecho estatal certificadas al máximo foro judicial del estado, pues es a este último al que le corresponde establecer el precedente al respecto. “Through certification of novel or unsettled questions of state law for authoritative answers by a State’s highest court, a federal court may save Time, energy, and resources and hel[p] build a cooperative judicial federalism’ ”. Arizonans for Official English v. Arizona, supra, pág. 7, citando a Lehman Brothers v. Schein, 416 US 386, 391 (1974).
Esa cooperación entre jurisdicciones hermanas se esfumó en este caso. Si esa va a ser la actitud del foro apelativo federal hacia este Tribunal, las partes pagarán los costos de una litigación ineficiente. ¿Tendremos que actuar en el futuro bajo la premisa de que no vale la pena certificar una pregunta porque no se nos va a otorgar la deferencia debida? Espero que no. Pero algo debe quedar claro: la deferencia entre jurisdicciones hermanas es una avenida de dos direcciones.

 Véase Amended Opinion and Order, pág. 2 esc. 1.

 íd., págs. 4-5.

 íd., págs. 5-6.

 íd., págs. 6-7.

 Esta ley fue derogada mediante el Plan de Reorganización Núm. 1-2011 (3 LPRA Ap. XVII) el cual, a su vez, derogó la Ley Núm. 75-2013.

 W. Vázquez Irizarry, Los poderes del Gobernador de Puerto Rico y el uso de órdenes ejecutivas, 76 Rev. Jur. UPR 951, 1005 (2007).

 En Humphrey’s Executor v. U.S., 295 US 602 (1935), el Tribunal Supremo federal se enfrentó al reclamo de William E. Humphrey (en adelante Humphrey), quien había sido nominado y confirmado por el Senado para presidir el Federal Trade Commission (FTC) por un término de siete (7) años. Este nombramiento fue otorgado bajo el mandato del ex Presidente de Estados Unidos, Herbert Clark Hoover. No obstante, cuando su predecesor, el presidente Franklin D. Roosevelt asumió el poder, destituyó a Humphrey de su puesto porque entendió que los objetivos de su administración se podían alcanzar con mayor eficiencia si él seleccionaba el líder de la FTC. Al analizar esta controversia, el tribunal reconoció que la comisión era apolítica, de manera que la naturaleza de las funciones realizadas en la FTC exigía imparcialidad. Id., pág. 624. Asimismo, concluyó además que las funciones del líder de la FTC no eran propiamente ejecutivas, sino predominantemente cuasilegislativas y cuasijudiciales. El tribunal entendió que el hecho de que la Asamblea Legislativa le asignara un término mayor al del servicio del presidente fue con el propósito de que la comisión pudiese implementar la ley de una manera justa y efectiva. En síntesis, la intención de los legisladores fue crear una comisión que pudiese ejercer su criterio libre e independientemente, sin estar a merced de la Rama Ejecutiva.

 Para ejemplificar la distinción de este razonamiento, en Acevedo Vilá v. Aponte Hernández, 168 DPR 443, 455-459 (2006), recurrimos a lo resuelto por otras jurisdicciones. Así, por ejemplo, destacamos cómo en el más alto foro del estado de Kentucky se concluyó que el acto de firmar una medida luego de ambos cuerpos legislativos haberla aprobado no constituye un acto discrecional legislativo del Presidente del Senado. Por el contrario, se consideró como un acto ministerial que, de ser incumplido, procedería otorgar un mandamus. Kavanaugh v. Chandler, 72 S.W.2d 1003 (1934). Asimismo, destacamos cómo el Tribunal Supremo de Missouri concluyó que el acto de certificar al Gobernador electo no es legislativo, sino ministerial, independientemente de si lo lleva a cabo el presidente de la Cámara de Representantes. State v. Osburn, 147 S.W.2d 1065 (1941). Luego de distinguir entre un acto legislativo y uno ministerial, en aquella ocasión concluimos que después de que un proyecto ha sido aprobado por ambas cámaras, la Asamblea Legislativa no tiene discreción para elegir si lo presenta o no ante el gobernador. Por consiguiente, este acto no está cubierto por la inmunidad legislativa procede el recurso de mandamus. Acevedo Vilá v. Aponte Hernández, supra, pág. 464.

 En Scheuer v. Rhodes, 416 US 232, 248 (1974), el Tribunal Supremo federal citó con aprobación las expresiones siguientes del Juez Hughes:
“ ‘If this extreme position could be deemed to be well taken, it is manifest that the fiat of a state Governor, and not the Constitution of the United States, would be the supreme law of the land; that the restrictions of the Federal Constitution upon the exercise of state power would be but impotent phrases, the futility of which the State may at any time disclose by the simple process of transferring powers of legis *119 lation to the Governor to be exercised by him, beyond control, upon his assertion of necessity. Under our system of government, such a conclusion is obviously untenable’ ”,

 En esta ocasión, el Tribunal Supremo federal entendió que la destitución de un empleado hecha por el Juez White no estaba cobijada por la inmunidad judicial absoluta, debido a que este actuó dentro de su capacidad administrativa. Forrester v. White, 484 US 219, 229 (1988). En su análisis, el tribunal expresó que estaba siendo consecuente con el tratamiento que se le había otorgado a la inmunidad, en cuanto se examinaban las funciones realizadas por el oficial y posteriormente se evaluaba si las actuaciones en controversia eran cónsonas con estas funciones. Id., pág. 224.

 A pesar de que citamos con aprobación esta jurisprudencia, es necesario hacer varias distinciones. En primer lugar, en Negron-Gaztambide v. Hernandez-Torres, 35 F.3d 25 (1er Cir. 1994), se trataba de un bibliotecario, mientras que en Vélez Ramírez v. Colberg Ramírez, 117 DPR 873 (1986), se trataba del director de la Biblioteca de Servicios Legislativos. Además de esto, en la controversia de autos no estamos enfrentándonos a un despido de personal legislativo. Por consiguiente, de ser planteado ante nuestra consideración, en su momento consideraremos la distinción entre un acto administrativo y uno legislativo, según Forrester v. White, supra, y la revocación expresa de Browning v. Clerk, U.S. House of Representatives, 789 F.2d 923 (Cir. DC 1986), en Fields v. Office of Eddie Bernice Johnson, 459 F.3d 1 (Cir. DC 2006), en el contexto particular de un funcionario legislativo.

 Cónsono con esta distinción entre un acto legislativo y uno administrativo, es pertinente destacar que en Baraka v. McGreevey, 481 F.3d 187, 200 (3er Cir. 2007), el Tercer Circuito también reconoció una distinción entre lo que es eliminar la posición de un empleado público y la destitución de un solo individuo. La primera acción está cobijada por la inmunidad legislativa, no así la segunda. El tribunal expresó que “ ‘despedir a un empleado en particular es una decisión de personal que no envuelve la creación de política pública’ ”, (Traducción nuestra). íd., citando a In re Montgomery County, 215 F.3d 367, 377 (3er Cir. 2000). Así, el tribunal sostuvo la destitución de Baraka porque este no tenía un interés propietario sobre la posición de poeta, pues esta fue abolida mediante un acto legislativo válido. Por consiguiente, la actuación del Gobernador fue un acto legislativo acreedor de protección. Véase, además, Leapheart v. Williamson, 705 F.3d 310 (8vo Cir. 2013). Esta jurisprudencia, contrario a lo argumentado por la Procuradora General, no es idéntica a la situación de autos porque en Baraka v. McGreevey, supra, el tribunal no se enfrentó al hecho de que la Asamblea Legislativa creara, posteriormente, otro puesto igual al del empleado destituido, pero con otro nombre.

 En la situación de hechos que originó esta controversia, el cargo de taquígrafa fue abolido y posteriormente se creó el nuevo cargo de secretaria en la División *123 de Edificios Públicos del Departamento del Interior. Ante estos hechos, confirmamos la Sentencia recurrida en la que se ordenó que la peticionaria continuara fungiendo como secretaria ya que no se debía permitir la abolición de un puesto con el solo propósito de deshacerse de la persona que lo ocupaba.

 Véase Case 3:13-cv-01646-DRD, Document 83, Transcript of Civil Hearing Held Before the Honorable Judge Daniel R. Domínguez, págs. 19-21.

 íd., págs. 50-58.

 íd., págs. 92-93.

 Es preciso destacar que la parte demandada reconoció que de los estatutos en controversia se deduce que la intención legislativa fue otorgarle una expectativa de continuidad en el empleo al Procurador durante el término de su cargo. Véase Alegato de la parte demandada, pág. 8.